468 So.2d 45 (1985)
Eric S. FUSELIER
v.
STATE of Mississippi.
No. 55750.
Supreme Court of Mississippi.
April 17, 1985.
*47 Dan C. Taylor, Travis Buckley, Ellisville, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by William S. Boyd, III, Special Asst. Atty. Gen., Jackson, Wyatt Collins, Laurel, for appellee.
En Banc.
DAN M. LEE, Justice, for the Court:
Eric Fuselier brings this appeal from the Circuit Court of Jones County where he was found guilty of the April 25, 1983 capital murder of Mrs. Rose Gunter. At the sentencing phase of his trial the jury determined that the surrounding aggravating circumstances outweighed the mitigating circumstances and that as a result, Fuselier should be sentenced to die. Fuselier now brings this appeal and asserts thirty separate arguments to support his contention that his conviction and sentence should be reversed. Upon review of the record we conclude that although most of Fuselier's arguments have no merit, he is correct that a substantial number of errors occurred during his trial. We are therefore compelled to reverse his conviction and sentence. Because we view these issues as dispositive of this appeal, we do not find it necessary to address the merits of Fuselier's other arguments.

THE FACTS
In the early morning hours of April 25, 1983, Mrs. Rose Gunter was brutally murdered in her home in the Shelton community of Jones County. When Mrs. Gunter failed to show up for work that morning, her daughter, Brenda Winstead (with whom she worked) phoned her husband, Joe Winstead, and asked him to check in on her mother. When Mr. Winstead arrived at his mother-in-law's home it was immediately apparent that something was askew. Her car was missing and the door into her house from the carport was open. Numerous files and ledgers were strewn about the carport floor. Entering the home, Mr. Winstead found a scene of horror and brutality. The house had been ransacked, a television was missing and Mrs. Gunter's bedroom door kicked in. Lying blindfolded and gagged on her blood stained bed sheets Mrs. Gunter lay dead.
An autopsy performed by Dr. Sergio Gonzalez revealed that Mrs. Gunter had been stabbed forty-one times. All of these wounds were to the front of her body. In Dr. Gonzalez's opinion she could have survived *48 only fifteen to twenty minutes after suffering these wounds; however, she did not necessarily live that long, depending on which of the wounds were inflicted first. The wounds had various angles of entrance which indicated to Dr. Gonzalez that more than one knife was probably used. The state produced two knives, either of which Dr. Gonzalez testified could have caused all of the wounds. These knives were later identified as having been in the possession of David McFee and Eric Fuselier.
McFee was living with Ms. Leslie Corley in a house near Mrs. Gunter's. Eric Fuselier had been staying with them since his escape from the Louisiana State Penitentiary about three weeks earlier. The state's theory was that McFee and Fuselier were jointly responsible for the murder of Mrs. Gunter.
Leslie Corley testified that on the day of the murder McFee and Fuselier spent the day in her yard working on a well pump. They were being assisted by Jerry Smith and Marion Nowlen. During the course of the day they had four to five cans of beer apiece. Because neither McFee nor Fuselier had any money, Smith loaned McFee twenty dollars to get a part for the pump. They quit working between 7:30 and 8:00 in the evening and McFee and Fuselier came into the house. They had dinner, played cards for a while and then Ms. Corley went to bed at approximately midnight or one o'clock. McFee and Fuselier stayed up. In the early hours of the morning McFee awoke Ms. Corley to tell her he was leaving for New Orleans.
During the day while McFee and Fuselier were gone Ms. Corley washed some clothes. Because she didn't have running water to the washing machine, Ms. Corley had to carry water in buckets to the machine. She noticed one of her children dipping a broom in a bucket of water and sweeping the driveway. She stated that a dried red material which resembled blood was on the driveway. When she took the clothes out of the washing machine, she found an additional pair of jeans, bandannas and a T-shirt that she had not placed there. She identified the T-shirt as belonging to Fuselier.
The state further attempted to connect Fuselier and McFee with Mrs. Gunter's murder by establishing that the knives which Dr. Gonzalez suggested may have been the murder weapons had been in their possession and control.
The state also produced David McFee's mother, Mrs. Freddie LeBlanc, who testified that Fuselier and her son arrived at her home in New Orleans, Louisiana on the morning of April 26, 1983, driving a blue Oldsmobile. Fuselier had scratches on his face which he explained he got from shaving. Mrs. LeBlanc agreed to purchase jewelry, a fan and a flashlight from them for twenty dollars. All of these items were identified by Mrs. Gunter's daughter as having belonged to her mother. Mrs. LeBlanc testified that the two men also had a large television in the trunk of the car but that she did not buy it.
Ricky Anthony Holmes, the owner of a paint and body work shop in New Orleans, testified that he was in his shop with an employee, Ricky Munn, when Fuselier and McFee drove up in a light colored Oldsmobile. McFee was driving. McFee told Holmes to repair the car and drive it back to Laurel, Mississippi. Holmes testified he received all of his instructions from McFee and that Fuselier was not involved in the conversation.
Ricky Munn testified that he had known McFee since they were children. Several hours after McFee and Fuselier left the Oldsmobile at the body shop, Munn borrowed the shop's wrecker and gave them a ride back to the Corley home in Mississippi. Shortly thereafter McFee and Fuselier were arrested.
The key defense witness was David McFee. McFee testified that he and he alone was responsible for killing Mrs. Gunter. He specifically denied that anyone helped him. On cross-examination it was revealed that McFee had made three prior inconsistent statements. In the first two of these, dated May 5, 1983 and June 1, 1983, respectively, McFee had denied any *49 involvement in Mrs. Gunter's killing. He blamed the entire episode on Fuselier. The third statement was an oral statement to investigators that was never reduced to writing. McFee testified that this third statement was not actually a statement but that the investigators had made statements to him and McFee simply agreed with those statements. He testified that because he had been willing to agree with anything the investigators told him, he could not remember what was said in the third statement.
As to the first two statements, McFee was adamant that they were untrue. He testified that the only thing Fuselier did was to help load Mrs. Gunter's television. He stated that they had taken some pills McFee had found at the dump and that Fuselier had fallen asleep in Mrs. Gunter's carport during the crime. According to McFee, Fuselier was totally unconscious. After killing Mrs. Gunter, McFee awakened Fuselier and they loaded the television set. Fuselier was driving Mrs. Gunter's light colored Oldsmobile as they left; however, because his erratic driving caused them to go off the highway, McFee took the wheel. McFee asserted that anything in his prior statements which was contrary to this version of the events was untrue. Over the objection of the defense counsel, McFee's first two statements were admitted into evidence.
On redirect examination, McFee testified that he had given a fourth statement on January 20, 1984. That statement was consistent with his trial testimony and in it he admitted all responsibility for Mrs. Gunter's murder. He testified that he had given the first three statements because he had been told by law enforcement officers that he would be helping himself if he did so. Prior to the January 20, 1984 statement, McFee had indeed entered into a plea bargain with the state by which he had pled guilty to Mrs. Gunter's murder and been sentenced to life imprisonment. Presumptively, up until the time the state learned of McFee's January 20, 1984 statement, it had expected him to testify against Fuselier.
The facts are further developed below as required by the discussion of legal issues. It is sufficient at this point to again state that the jury determined that Fuselier was guilty of capital murder and following the sentencing phase of trial, he was sentenced to death.

THE LAW

THE ADMISSIBILITY OF McFEE'S PRIOR INCONSISTENT STATEMENTS
As explained above, during the cross-examination of David McFee, the state moved to introduce two prior inconsistent written statements of his. The state offered the first statement after examining McFee in relation to it. Throughout McFee's testimony he freely admitted that he had made the statement. He was cross-examined as to all of the inconsistencies between the statement and his testimony. He freely admitted those inconsistencies and asserted the falsity of the statement. It was after the state had fully used the statement to impeach McFee's credibility that it offered the document itself into evidence. At that point the defense objected on the ground that McFee had admitted making the statement and the inconsistencies therein. The trial court overruled that objection and accepted the statement into evidence.
As to the second statement, the state offered it into evidence prior to examining McFee regarding its inconsistency with his testimony. The state merely established that McFee had made the statement and signed it. The defense objected that no foundation had been laid for admitting the statement and because the statement had not been provided to the defense under the rules of discovery. The court overruled both objections and admitted the second statement into evidence.
This Court recently decided the case of Moffett v. State, 456 So.2d 714 (Miss. 1984). In that case the state was permitted to introduce into evidence a prior out-of-court statement made by a witness who admitted that he had made the statement and insisted *50 that its contents were untrue. We addressed the admissibility of the witness' statement as follows:
Where the non-party witness admits having made the prior, out-of-court statement, the statement where reduced to written form, should never be introduced into evidence.

If the witness confesses or admits having made prior inconsistent statements, ordinarily there is no necessity for further proof, as by the admission of the prior inconsistent written statement.

Davis v. State, 431 So.2d 468, 473 (Miss. 1983); Sims v. State, 313 So.2d 388, 391 (Miss. 1975); Hammons v. State, 291 So.2d 177, 179 (Miss. 1974); Hall v. State, 250 Miss. 253, 264, 165 So.2d 345, 350 (1964); see Hubbard v. State, 437 So.2d 430, 434 (Miss. 1983); ("obviously for impeachment purposes"); Murphy v. State, 336 So.2d 213, 216-17 (Miss. 1976) (defendant entitled to instruction that prior inconsistent statement may not be used as proof of guilt).
* * * * * *
There is a more practical reason why the statement should not have been given to the jury. The average juror will have a difficult enough time without the statement sitting in his lap keeping distinct in his mind that which he has heard as evidence and what he has been told may be considered for impeachment only. Many suggest it is folly to think juries can  or will even attempt to  keep this distinction in mind. (Emphasis added)
Moffett at 719, 720.
Just as the admission of the witness' statements in Moffett constituted reversible error, so do the admission of McFee's statements in the instant case. McFee's first statement was admitted after he fully acknowledged making the statement and the inconsistencies contained therein. The second statement was admitted into evidence before any predicate was laid showing it was inconsistent with McFee's testimony at trial. As in Moffett, the error of admitting these statements into evidence was compounded when the district attorney argued them as substantive evidence of Fuselier's guilt during closing arguments. The district attorney told the jury "David McFee testified for him but, you know, after I got through cross-examining David McFee I felt like he made as good a witness for the state of Mississippi as he did for Eric Fuselier, because David McFee, if you will read his statement which is in evidence, he admits about ninety percent of it."
As we stated in Moffett:
No resort to notions of "death is different" or "heightened scrutiny," see, e.g., Williams v. State, 445 So.2d 798, 810 (Miss. 1984); Laney v. State, 421 So.2d 1216, 1217 (Miss. 1982), is necessary for us to conclude that such errors so infected the proceedings below that [the defendant] has been denied a fair trial."
Moffett at 721.

THE ADMISSIBILITY OF THREATS OF FURTHER PROSECUTION OF McFEE RELATED TO HIM BOTH DIRECTLY AND THROUGH HIS MOTHER
The critical factual issue at trial was whether McFee acted alone in murdering Mrs. Gunter or was aided by Fuselier. Fuselier's entire defense was founded on the credibility of McFee. In Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the United States Supreme Court held that when the reliability of a given witness may well be determinative of guilt or innocence evidence of any understanding or agreement as to a future prosecution of that witness is relevant to his credibility and the jury is entitled to know of it. This Court thought the Giglio decision so important that it was attached as an appendix to King v. State, 363 So.2d 269 (Miss. 1978). In King, Chief Justice Patterson wrote:
The testimony of Romanus, whether true or untrue, was purchased by a grant of immunity, specifically, freedom from life imprisonment. We, of course, do not know what effect the grant of freedom *51 had upon his testimony, but the potential of its affecting the witness's credibility is so great that it cannot be ignored. A jury always has great responsibility in resolving factual disputes and its responsibility in cases of this nature is awesome. It needs, and the courts must afford, every proper assistance to the jury in its search for the truth. Essential to this effort is knowledge of the inducements likely to affect the witness's credibility so it may be considered by the jury in its deliberations.
* * * * * *
Moreover, the truthfulness of Romanus' testimony could not likely be ascertained, in our opinion, without consideration of the witness's credibility. The importance of his testimony is obvious and it is also incriminating, but its effect, however material and relevant, could be instantly swept away if the jury believed it to be untrue, the product of purchase rather than material evidence honestly expressed.
A witness's credibility is of such importance in our system of justice that all courts recognize the great need for, and grant, broad scope upon cross-examination, but even then at times, regardless of the skillfulness of the cross-examination, essential facts, regretfully, do not come to the jury's attention.
King at 274.
More recently, in Barnes v. State, 460 So.2d 126 (Miss. 1984), we reaffirmed the rule that not only must a leniency agreement with a state witness be disclosed to the defense but also, the defense is entitled to present evidence of that agreement to the jury where such would tend to impeach or show bias in the testimony of the witness. Unquestionably, the right to impeach or show bias extends to a redirect examination designed to explain the cross-examination, the witness's expressions and his motives for using them. Cole v. Tullos, 228 Miss. 815, 90 So.2d 32 (1956). Additionally, Miss. Code Ann. § 13-1-13 (1972) provides that a witness may be examined "touching his interest in the cause or his conviction of any crime, and his answers may be contradicted, and his interest or his conviction of a crime established by other evidence."
Once McFee's credibility had been put into issue by the state, Fuselier sought to put on proof, both by examination and the introduction of documents, as to McFee's motivation in giving both the exonerating and inculpatory statements. Specifically, Fuselier wanted to show that McFee made the inculpatory statements as the result of the promise not to pursue the death penalty against him. Indeed, McFee had pled guilty to Mrs. Gunter's murder and received a life sentence on December 12, 1983, three months before Fuselier's trial.
Fuselier also wanted to establish that McFee had been threatened with an additional sixty-five years incarceration and the possibility of a death sentence if he refused to testify for the state and instead testified for Fuselier. In furtherance of this goal, he attempted to show that after McFee gave the exonerating statement, dated January 20, 1984, the state charged him with three additional offenses arising out of the murder. The evidence which Fuselier attempted to put forth consisted of three affidavits charging McFee with armed robbery, armed rape, and auto theft.[1] Once the court ruled that those documents were inadmissible, Fuselier's attorney questioned McFee as to whether those documents reflected that on January 24, 1984 McFee was charged with other crimes arising out of the murder of Mrs. Gunter. The trial court sustained an objection to this question before McFee could answer.
Fuselier had also proffered the testimony of McFee's mother following a ruling from the trial court that the testimony was inadmissible. That proffer stated that if Mrs. LeBlanc had been permitted to testify she would have stated that an investigator *52 from the district attorney's office told her that it would be in the best interest of her son to testify for the state of Mississippi and that if he did not do so he would be subjecting himself to an additional sixty-five years in the penitentiary. The court ruled that Mrs. LeBlanc's proffered testimony was inadmissible "on the grounds its hearsay."
The above detailed efforts of Fuselier to present testimony relative to McFee's credibility were not objectionable on hearsay grounds. That argument was disposed of in Barnes, supra. See also, Lee v. State, 338 So.2d 395 (Miss. 1976), wherein we held: that to constitute hearsay, extra judicial words must by some means present a statement, declaration, or assertion introduced for the purpose of proving the truth of the matter asserted. Fuselier's interest was in establishing McFee's credibility. He wanted to be able to show both that McFee had made inculpatory statements in order to save himself and that McFee was now willing to make exonerating statements in spite of what may happen to him. This evidence goes directly to the issue of McFee's credibility and not whether McFee would really be subjected to an additional sixty-five years imprisonment and the death penalty. It was therefore not offered to prove the truth of the matter asserted and was not objectionable on hearsay grounds.
If, as we have repeatedly held, the prospect of immunity from prosecution is relevant to the credibility of a witness's statement, so then must be the threat of further prosecution. The duty of assessing McFee's credibility belonged exclusively to the jury and as that issue was critical to the defense the trial court committed reversible error by refusing to allow the jury to be fully informed of the facts relating to it.

THE PRESENCE OF THE VICTIM'S DAUGHTER WITHIN THE RAIL THROUGHOUT THE TRIAL
Rule 501 of the Mississippi Uniform Criminal Rules of Circuit Court Practice reads in part:
Only officers of the court, attorneys and litigants or one representative of a litigant in the case on trial will be permitted within the rail of the courtroom, unless authorized by court.
The rule then goes on to temper whatever discretion it has vested within the trial judge with the admonition "No conduct interferring with or obstructing the administration of justice will be tolerated." One of the polestar considerations in affording a defendant a fair trial is that no one be punished for a crime without "a charge fairly made and fairly tried in a public tribunal free of prejudices, passion, excitement, and tyrannical power." Sheppard v. Maxwell, 384 U.S. 333, 350, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600, 613 (1966) quoting Chambers v. Florida, 309 U.S. 227, 236-237, 60 S.Ct. 472, 477, 84 L.Ed. 716, 722 (1940).
In the instant case, Brenda Winstead, Mrs. Gunter's daughter, was the first witness for the state. Immediately after she completed her testimony Mrs. Winstead took a seat within the rail of the courtroom to the right of and slightly behind the district attorney's seat at counsel table. This placed her between the prosecutor and the bailiff and facing the jury box. Defense counsel objected immediately to Mrs. Winstead remaining within the rail of the courtroom; however, the trial court ruled that "Each side is entitled to have one member of his family present within the railing of the court." The defense repeated its objection during the guilt phase of trial, and before and after the sentencing phase. Each time it was overruled. The final objection included the following comment by defense counsel:
MR. BUCKLEY:
If the Court please, and I don't know if the Court remembers, but at the outset of the trial I objected to the State's first witness sitting in the courtroom, and in effect at the counsel table. She is seated just to the right of the District Attorney, and what I wanted the record to reflect *53 is that she has continued to sit there throughout the course of the trial and has exhibited emotion in the presence of the jury and conferred with the District Attorney throughout the trial on  I said throughout  on several occasions during the course of the trial, and sat right at his immediate right throughout the trial.
The court replied that there would be no need to put on proof and that "there's no dispute by the court. In fact, the court will affirm that that is correct." Regardless, the court overruled the defense's objections.
The state responds by stating that it finds Fuselier's argument "amusing." We fail to see the humor. There can be no graver proceeding than when a human being is put on trial for his or her life. The right to a fair trial includes the right to a verdict based on the evidence and not extraneous prejudicial happenings in and around the courtroom. Sheppard, supra; Chambers, supra. In numerous contexts this Court has held that a verdict based on anything other than the evidence of the crime is tainted and where it is the result of bias, passion or prejudice it cannot be allowed to stand. Sumrall v. State, 257 So.2d 853, 854 (Miss. 1972), appeal after remand, 272 So.2d 917, 919 (Miss. 1973), (prosecutors should refrain from doing or saying anything that would cause the jury to return a verdict on matters other than evidence relative to the crime); Sloane v. State, 437 So.2d 16, 18 (Miss. 1983), (evidence of other crimes is generally inadmissible); Howell v. State, 246 So.2d 95, 96, cert. denied, 404 U.S. 852, 92 S.Ct. 90, 30 L.Ed.2d 92 (Miss. 1971), (change of venue is appropriate to protect a defendant from a verdict which is the result of public excitement and prejudice); Coker v. State, 200 Miss. 535, 540, 27 So.2d 898, 900 (Miss. 1946), (the solution of jury issues must be safeguarded so that the verdict may be confidently regarded as the product of the law and the evidence uninfluenced by any extraneous pressure); Perkins v. State, 244 So.2d 414, 415 (Miss. 1971), (a conversation between a juror and a witness following the witness's testimony constituted grounds for mistrial).
We conclude that Mrs. Winstead's presence at the counsel table cannot be justified by Rule 501 of the Uniform Criminal Rules of Circuit Court Practice and further that it constituted an inflamatory and prejudicial element. With reference to Rule 501, Mrs. Winstead was neither an officer of the court, attorney, litigant or representative of a litigant. Her presence at counsel table and open display of emotion[2] presented the jury with the image of a prosecution acting on behalf of Mrs. Winstead. Because such an erroneous view can all too easily lead to a verdict based on vengence and sympathy as opposed to reasoned application of rules of law to the facts we conclude that the trial court should not have permitted Mrs. Winstead to remain within the bar of the courtroom.

DID THE TRIAL COURT ERRONEOUSLY GRANT THE STATE CHALLENGES FOR CAUSE BASED ON RESPONSES TO VOIR DIRE QUESTIONING CONCERNING THE DEATH PENALTY?
The most recent pronouncement of the United States Supreme Court on this question appears in Wainright v. Witt, ___ U.S. ___, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). In that case the Court stated that it would continue to apply the rule of law announced in Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). That rule, succinctly stated, is that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams at 448 U.S. 45, 100 S.Ct. 2526, 65 L.E.2d 589. The juror must be able to consider and decide the facts *54 impartially and conscientiously apply the law.
Fuselier argues that the trial court failed to consider the correct standard when it granted the state challenges of several jurors for cause. He specifically complains of the exclusion of jurors Mercer, Messemore, Sowell, Landrum, Clinton and Long.
Juror Mercer testified that he did not think he could bring back a verdict of guilty with pieces of evidence missing. The reference to pieces of evidence missing was in response to the district attorney's voir dire statements that the state's case was similar to a jigsaw puzzle with pieces missing. The district attorney was trying to explain that the case against Fuselier was based on circumstantial evidence. Later, Mercer testified that he had previously stated he did not think he could be fair in a murder case. This is the total voir dire concerning juror Mercer.
Juror Messemore stated, "I would have to hear the evidence before I could say for certain, but I'm not sure that I could say this man here should die ... I don't think I could. Now, if it would have been somebody I knew or something like that, you know, I could probably. But, in this case, I don't believe there is any evidence with pieces missing that I could say that this man should die." In discussing the peremptory dismissal of juror Messemore, the court stated, "As I recall it, he stated that he had scruples against the inflicting of the death penalty and there wasn't any way  my notes reflect  that he could return a death penalty verdict."
Juror Sowell stated: "I don't know if I could with pieces missing." Mrs. Sowell also stated that she could be a fair and impartial juror. In the discussion of whether juror Sowell should be peremptorily excused, the district attorney stated, "Yes, sir, she told me she could not put it aside ... the fact that he would possibly get the death penalty. That she could not give the death penalty and could not put it aside." Mrs. Sowell also stated that she could be a fair and impartial juror.
Juror Landrum stated that she could be a fair and impartial juror. She did stand up when the district attorney asked "Are there any of you that just could not vote the death penalty no matter what the facts or what the circumstances are? No matter what?" Mrs. Landrum was never asked any questions individually after standing in response to that question. In the discussion between the attorneys and the court as to whether Mrs. Landrum should be excused, the district attorney said, "She just said she could not impose the death penalty in this case." There is no evidence in the record that Mrs. Landrum made that statement other than by standing in response to the district attorney's initial question.
As to juror Clinton, the defense expressly stated that it had no objection to her being excused.
Juror Long stated, "I don't believe there is any way that I could do it." Juror Long also stated that she had previously stated that she could not be fair in a murder trial.
As can be seen from a review of the above detailed descriptions of the voir dire, the trial court clearly committed reversible error in excusing jurors Messemore and Sowell for cause. There was no indication from these jurors' comments that they would be prevented or substantially impaired in the performance of their duties as jurors, nor that they would be unable to decide the facts impartially and conscientiously apply the law. The fact that they would be hesitant to inflict the death penalty in a case based entirely on circumstantial evidence does not constitute grounds to excuse them for cause. It is apparent from a review of the record that the district attorney's analogy to a jigsaw puzzle with pieces missing was confusing and almost certain to invoke a response indicating uneasiness and uncertainty by jurors who were in good faith attempting to address what was at that time nothing more than a hypothetical moral dilemma. Without any knowledge of the strength of the state's case or the meaning of the "missing pieces" analogy, it is completely *55 understandable how jurors who are fully capable of following the court's instructions and juror's oath would be led to a hesitancy to state that they can impose the death penalty. As stated by the United States Supreme Court in Adams, "Neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty." Adams, 448 U.S. at 50, 100 S.Ct. at 2529, 65 L.Ed.2d at 593. Absent a clear showing that the prospective juror would be unable to follow the court's instructions and obey the juror's oath, that juror's feelings regarding the death penalty do not constitute grounds for a challenge and the granting of such a challenge is reversible error. Wainright v. Witt, supra, Adams v. Texas, supra.
Furthermore, the failure to fully develop any voir dire regarding Mrs. Landrum rendered her dismissal for cause error. A clear showing that a juror's views would prevent or significantly impair the performance of his or her duties requires more than a single response to an initial inquiry.

THE FAILURE TO COMPLY WITH THE RULES OF DISCOVERY
We have been frequently called upon to interpret Rule 4.06 of the Mississippi Uniform Criminal Rules of Circuit Court Practice. That rule states in part:
The prosecution shall disclose to each defendant or to his attorney, and permit him to inspect, copy, test, and photograph upon request and without further order the following:
(1) Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial;
(2) Copy of any recorded statement of the defendants to any law enforcement officer;
(3) Copy of the criminal record of the defendant, if proposed to be used to impeach;
(4) Copy of crime lab reports or report or any tests made;
(5) Exhibit any physical evidence and photos to be offered in evidence; and
(6) Copy of any exculpatory material concerning defendant.
Upon a showing of materiality to the preparation of the defense, the court may require such other discovery to defense counsel as justice may require.
In Harris v. State, 446 So.2d 585 (Miss. 1984), we addressed the failure of the state to comply with a discovery order requiring it to produce an alleged murder weapon. The court reversed Harris' conviction and stated:
Therefore, upon motion of appellant and the order of the circuit judge in this cause to produce all tangible things, the prosecution had the affirmative duty of producing the weapon. They are not now free to claim that the defense had merely to request production one more time. Failure of the state to produce the weapon was a violation of both Rule 4.06 and the court's order and had the effect of stymieing Harris' ability to present his defense. Failure to comply with an order to produce renders that material inadmissible at trial and its wrongful admission renders a conviction reversible. (Emphasis in original.)
Harris at 589.
Numerous holdings of this Court support the Harris rationale. Barnes v. State, 460 So.2d 126 (Miss. 1984); Ford v. State, 444 So.2d 841 (Miss. 1984); Tolbert v. State, 441 So.2d 1374 (Miss. 1983); Box v. State, 437 So.2d 19 (Miss. 1983); Morris v. State, 436 So.2d 1381 (Miss. 1983); Jackson v. State, 426 So.2d 405 (Miss. 1983).
Specifically, Fuselier argues that the state failed to produce McFee's second statement and photocopies of what were alleged to be Fuselier's footprints found on papers in Mrs. Gunter's carport. As to McFee's statement, Fuselier's motion for production and inspection requested production of any statements of codefendants. The trial court's order provided that he be *56 given these things. The state counters that no error occurred for several reasons. First, at oral argument the state contended that it did produce McFee's second statement although there was no specific memory of having done so. Fuselier's counsel replied at argument by strenuously denying having received a copy of the statement. Furthermore, Fuselier's version of the events is supported by the record wherein the district attorney replied to the defense's objection stating: "If it please the court, I don't know that I have to provide them with Mr. McFee's confession."
The state next argues that McFee's statement was not exculpatory and was therefore not required to be produced. This argument has no merit for the request and ensuing order did not limit themselves to exculpatory statements, but included all statements of codefendants.
Finally, the state argues that the trial court expressly ordered that any noncompliance with discovery be brought to the court's attention twenty-four hours ahead of trial. The state argues that the failure to notify the court of noncompliance with discovery constituted a waiver. Of course, a rule such as the one imposed by the trial court is difficult to enforce for it places on the defendant the burden of enumerating items which he may not know are in existence. The purpose of discovery is to eliminate trial by ambush or surprise. See Morris, supra and Jackson, supra. The rules give the parties a right to know what evidence may be used at trial and a waiver of that right must be both knowing and intelligent. From the record and the oral argument, there is no indication that the defense knew of McFee's second statement. Therefore, when the state failed to produce it after the first request for discovery, the right to obtain that statement could not have been waived by failing to bring the noncompliance to the attention of the trial court.
As to the photocopies, the state's forensic expert on latent shoe prints testified that he was able to lift prints off of ledger cards found in Mrs. Gunter's carport. The expert stated that procedurally the latent prints are dusted and then photocopied because the dusted print itself eventually fades and becomes of no value. Therefore, the photocopy is retained as a permanent record. The state correctly points out that both the ledger cards and the photocopies were admitted into evidence. At trial, the state asserted two reasons for failing to provide the defense with copies of the ledger sheets. The state first asserted that they were the work product of the lab technician. Next, the state argues that the photocopies were in the possession of the crime lab and not the prosecutor.
Certainly, the photocopies of the prints were not work products. Those photocopies constituted tangible evidence which the state introduced against Fuselier and were discoverable for that reason. While the defense may have known that the state had latent prints found at the scene of the crime, there is absolutely no indication in the record that the defense had any knowledge that the state was relying on photocopies of those prints. The use of photocopies to make class comparisons may undoubtedly open the door to argument contesting the reliability of any such comparisons. The failure to discover these materials so that the defense could adequately prepare for the issue was error.
Further, where discoverable material is in the possession of the state crime laboratory, an agency charged with law enforcement or any other state agency or office, the prosecution's obligation to produce it according to the rules of discovery remains unchanged. The state is not free to hide discoverable material behind a curtain of agency. For purposes of discovery all of these agencies are "the state." See United States v. Deutsch, 475 F.2d 55 (5th Cir.1973); Box v. State, 437 So.2d 19 (Miss. 1983), concurring opinion of Justice Robertson, f.n. 4.

THE FLIGHT INSTRUCTION
Recently, in Pannell v. State, 455 So.2d 785 (Miss. 1984), this Court held that an *57 instruction that flight may be considered as a circumstance of guilt or guilty knowledge is appropriate only where that flight is unexplained and somehow probative of guilt or guilty knowledge.
At trial the state produced evidence that when law enforcement officers arrived at the Corley home to arrest McFee and Fuselier, Fuselier jumped out a back window and started to run toward some woods. He made it only a short distance before he complied with an order to halt issued from a shotgun wielding law enforcement officer. Fuselier argues that evidence of his flight was not probative of his guilt or guilty knowledge of Mrs. Gunter's murder because, as an escapee, he had an independent sufficient cause to flee. During the guilt phase of Fuselier's trial the fact that he was an escapee from the Louisiana State Penitentiary was not explained to the jury; however, this fact was known to the court. If Fuselier's flight is probative of his guilt or guilty knowledge of the Gunter murder, it is equally probative of his guilt of escape. Fuselier was obviously put in a no-win situation by either being required to explain his flight and the fact that he was a prison escapee or not explaining the flight and subjecting himself to a flight instruction. Here, because the court was aware of an explanation for Fuselier's flight, which was at that time inadmissible, we are of the opinion that the flight instruction should not have been granted.

THE EFFECT OF OUTSIDE CONTACT WITH A JUROR DURING DELIBERATIONS ON THE SENTENCING PHASE
As we have stated above, a jury's verdict must be based upon the evidence and not affected by extraneous influences. We have also repeatedly recognized the gravity and immeasurable solemnity of a jury's deliberations during the sentencing phase of a capital murder trial. See Williams v. State, 445 So.2d 798 (Miss. 1984); Wiley v. State, 449 So.2d 756 (Miss. 1984). The importance of this deliberation may at times cause inconvenience and hardship; however, to allow distractions and outside influences to infect the jury's thoughts at this critical juncture of the proceedings is to devalue human life.
At a hearing on Fuselier's motion for a new trial, the court took the testimony of Willie Clark, the husband of one of the jurors. Mr. Clark testified that while the jury was deliberating during the sentencing phase he sent a message through the bailiff that his wife's mother had died. The bailiff allowed him to speak to his wife on the phone. The only words he told her were "Baby, your mother passed."
There is no member of this Court who would deny feeling a degree of anguish and sympathy for Mrs. Clark; however, we cannot lose sight of the fact that the most important issue at hand during the sentencing deliberations was Eric Fuselier's life. It is part of the universal human experience that the ability to reason often folds in the face of grief. The loss of only one reasoned vote against the death penalty may have resulted in that verdict. While we do not mean to imply that Mrs. Clark's or anyone else's vote was not based on reason and rules of law, we, as mortals, cannot be blind to the possibility of a subconscious yet substantial impact upon the jury's verdict. We repeat the rule that during a jury's deliberations outside influences must be eliminated if possible and minimized if not. Otherwise the integrity of the verdict is in question and a mistrial is appropriate. Perkins v. State, 244 So.2d 414 (Miss. 1971).

CONCLUSION
Having addressed what we view as substantial errors in Eric Fuselier's trial and found that they merit a reversal of his conviction and sentence of death, we decline to address his other assignments of error. Based on all of the foregoing, we hereby reverse and remand Eric Fuselier's conviction of capital murder and sentence of death to the Circuit Court of Jones County for a new trial on all issues.
REVERSED AND REMANDED.
*58 PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
NOTES
[1] It was revealed at oral argument that McFee was subsequently convicted of two additional charges.
[2] We also note that when Mrs. Winstead first took the witness stand the district attorney had to ask her to gain her composure.