## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 1999-KA-00243-SCT

*JOHNNY DUMAS a/k/a JOHNNY M. DUMAS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/02/1998 |
| TRIAL JUDGE: | HON. ELZY JONATHAN SMITH, JR. |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | AZKI SHAH |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEAN SMITH VAUGHAN |
| DISTRICT ATTORNEY: | LAURENCE Y. MELLEN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/30/2000 |
| MOTION FOR REHEARING FILED: | 5/22/2000; denied 7/20/2000 |
| MANDATE ISSUED: | 3/5/2002 |

**EN BANC.**

**PRATHER, CHIEF JUSTICE, FOR THE COURT:**

### STATEMENT OF THE FACTS AND CASE

¶1. On June 9, 1997, Johnny Dumas ("Dumas") was indicted on thirteen separate counts of "unlawfully, wilfully, and feloniously taking an amount greater than the amount won at the game of blackjack" at the Lady Luck Casino in Coahoma County, in violation of Miss. Code Ann. § 75-76-301 (Supp. 1999). Dumas was also indicted under the same statute for "altering or misrepresenting the outcome of the game of blackjack" and for unlawfully canceling a bet after acquiring knowledge of the outcome of the game. On November 12, 1998, Dumas was tried before a duly empaneled jury in the Circuit Court of Coahoma County.

¶2. At trial, the State built its case upon the testimony of three witnesses as well as upon videotape allegedly showing Dumas committing illegal acts at the blackjack table at the Lady Luck Casino. Michael Bush ("Bush"), a surveillance supervisor at Lady Luck, testified that, on April 20, 1997, he had supervised the videotaping of the gambling which had occurred at the blackjack table of Tyrone Wells ("Wells"), a dealer at the casino. In conjunction with Bush's testimony, the State played for the jury videotape taken of Wells' blackjack table on the day in question.

¶3. The defense successfully objected when Bush attempted to testify that one frame showed a dealer overpaying a customer, and the trial judge ruled that it was for the jury to decide whether the videotape

depicted such overpaying. The judge did allow Bush to testify as to the general violations which, in his view, were depicted on the videotape. Bush testified that, in his opinion, the following violations occurred:

> Oh, overpayments, getting paid for hands that did not win, the dealer making his self [sic.] bust out, taking to many cards for his self [sic.] and paying - - and the dealer paying losing hands.

¶4. Clay Barnett, an employee of the Mississippi Gaming Commission, testified that he was called to the Lady Luck Casino on April 20, 1997 in order to investigate allegations that a dealer had been "dumping the game on blackjack." Barnett testified that he was led to the security department of the casino, where he encountered dealer Wells and two patrons, including Dumas. Barnett testified that he asked Dumas whether he knew Wells or if he had any knowledge of cheating at the table, and Barnett testified that Dumas responded "no."

¶5. Barnett conceded on cross-examination that he had also interviewed Wells and that Wells had "fully admitted to wrongdoing" but had asserted that Dumas was not involved in the crime. Specifically, Barnett testified that:

> Q: And he told you that Mr. Dumas had nothing to do with it; isn't that correct?

> A: Correct. He said he didn't know any of the players at the table.

Thus, according to Barnett's testimony, both Dumas and Wells claimed that they did not know each other. However, the State produced Nita Dumas-Wells, the sister of Dumas, who acknowledged that she was married to Tyrone Wells. Upon eliciting this testimony, the State rested, and the defense rested without calling any witnesses.

¶6. The jury returned a verdict finding Dumas not guilty of six counts (Counts I, II, IV, VII, IX, and XIII) of the indictment[1] and finding him guilty of seven counts (Counts III, VIII, X, XI, XII, XV, and XVI). Dumas was sentenced to serve a term of two years in the custody of the Mississippi Department of Corrections, and he was ordered to pay a fine of five hundred dollars. Dumas' post-trial motions for JNOV and/or new trial were denied, and he timely appealed to this Court.

> **I. The trial court committed reversible error in not sustaining Appellant's motion for a directed verdict of not guilty at the close of the State's case in chief and at the close of all of the evidence, and in failing to sustain Appellant's motion for judgment of acquittal, or in the alternative, new trial.**

¶7. Upon conviction of the criminal defendant, the presumption of innocence is replaced by a presumption that the conviction is valid and may only be rebutted by a finding of reversible error on appeal. *Gollott v. State*, 646 So.2d 1297, 1300 (Miss.1994). When a defendant challenges the sufficiency of the evidence to support a conviction, the evidence which supports the verdict is accepted as true by the reviewing court, and the State is given the benefit of all reasonable inferences flowing from the evidence. *Rhodes v. State*, 676 So.2d 275, 281 (Miss.1996).

¶8. The jury returned a verdict finding Dumas not guilty of six counts (Counts I, II, IV, VII, IX, and XIII) of the indictment[2] and finding him guilty of seven counts (Counts III, VIII, X, XI, XII, XV, and XVI). Six of the seven counts on which Dumas was convicted were identical, except for the video footage to which they refer[3]. (Counts VIII, X, XI, XII, XV, and XVI). These identical counts read as follows:

That Tyrone C. Wells, Johnny Dumas, and James Darryl Luckadue, individually or while aiding or abetting and/or acting in concert with each other, late of Coahoma County, Mississippi, on or about April 20, 1997, in the County and State aforesaid, and within the jurisdiction of this Court, did unlawfully, wilfully, and feloniously, at the Lady Luck Rhythm and Blues Casino, as shown at the time of _____ on surveillance video, take an amount greater than the amount won at the game of blackjack, contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Mississippi.

These counts are based on the language of Miss. Code Ann. § 75-76-301(c) (Supp. 1999), which provides that:

It is unlawful for any person (c) To claim, collect or take, or attempt to claim, collect or take, money or anything of value in or from a gambling game, with intent to defraud, without having made a wager contingent thereon, or to claim, collect, or take an amount greater than the amount won.

Dumas argues that the State failed to prove an intent to defraud on his part and that the jury's verdict should accordingly be reversed.

¶9. Although the evidence of an intent to defraud on the part of Dumas is not overwhelming, this Court concludes that a reasonable juror could have found that such intent to defraud was established by the State beyond a reasonable doubt. All parties concede that fraud did take place at Tyrone Wells' blackjack table, and Wells himself admitted that he did, in fact, knowingly commit fraud against the casino. Thus, there is clear evidence that a crime took place at Wells' blackjack table on April 20, 1997, and the only issue in question is whether Dumas knowingly participated in this crime.

¶10. The State presented testimony that Wells and Dumas were brothers-in-law, but testimony established that both Wells and Dumas had falsely represented that they were not even acquainted. In the view of this Court, the fact that the parties were related makes the State's case a stronger one as it relates to the possibility of a common scheme or purpose to defraud the casino. Moreover, the fact that the parties both lied about this relationship makes the State's case much stronger in this regard.

¶11. Also supportive of the jury's verdict is the fact that the crime was recorded on videotape. The jurors clearly examined the videotapes carefully, as evidenced by the fact that they requested and were granted a magnifying glass to view the video footage more carefully. The jurors' close attention to the videotape is also evidenced by the fact that they returned "not guilty" and "guilty" verdicts with regard to different counts of the indictment which were worded exactly the same, except with regard to the time at which the videos were taken.

¶12. The fact that the jury returned differing verdicts with regard to otherwise identical counts, depending upon which video frames were referenced, clearly indicates that the jurors based their verdict upon their evaluation of the conduct which they observed on the videotape. Such being the case, the present appeal does not present a compelling case for reversal, given that this Court should properly show deference to the trier of fact in its evaluation of duly admitted evidence such as the videotape. It is entirely plausible that a juror might have been able to gain insights into Dumas' state of mind by observing his "body language" on the videotape. While it can not be said with any certainty that this is the case, this Court must give all reasonable inferences which can be drawn from the evidence to the State in the present appeal.

¶13. Also, the fact that the jurors found that Dumas had, as stated in the indictment, "take(n) an amount greater than the amount won" on six separate occasions could lead to an inference of fraud by Dumas, more so than if the jury had found that Dumas had done so on only one or two occasions. This Court concludes that the evidence presented in the present case could lead a reasonable juror to conclude that Dumas did knowingly take part in the crime, and this point of error is without merit.

¶14. This Court's final basis for affirming the jury's verdict comes from a review of the videotape itself. While it is not for this Court on appeal to conduct a de novo review of the evidence, we conclude that the videotape does depict activities which a reasonable juror could consider to be in violation of Miss. Code Ann. § 75-76-301 (Supp. 1999).

¶15. The only other count on which Dumas was convicted was Count III, which reads as follows:

> That Tyrone C. Wells, Johnny Dumas, and James Darryl Luckadue, individually or while aiding or abetting and/or acting in concert with each other, late of Coahoma County, Mississippi, on or about April 20, 1997, in the County and State aforesaid, and within the jurisdiction of this Court, did unlawfully, wilfully, and feloniously, at the Lady Luck Rhythm and Blues Casino, as shown at the time of _____ on surveillance video, alter or misrepresent the outcome of the game of blackjack on which wagers had been made after the outcome was made sure but before it was revealed to the players by withholding a hit card, contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Mississippi.

In convicting Dumas on this count, the jury concluded that Dumas had "aided or abetted" Wells in "misrepresenting the outcome of the game of blackjack on which wagers had been made after the outcome was sure but before it was revealed to the players by withholding a hit card."

¶16. In this regard, this Court's analysis of Dumas' convictions on the previous counts is equally applicable in the present context. Dumas argues that the decision of whether or not to withhold a hit card is the dealer's alone, and he notes once again that Wells asserted that he had acted alone. This Court concludes, however, that a reasonable juror could have refused to believe this assertion by Wells, given his close relationship to Dumas, given the fact that both parties had lied about that relationship, and given that the incriminating conduct was captured on videotape. This Court also concludes that a reasonable juror could have found Dumas to have aided and abetted Wells in withholding a hit card. As with the previous counts, the jurors were able to personally view the alleged crime, and they concluded that the State met its burden of proving that Dumas had in fact aided and abetted Wells in this regard.

¶17. Moreover, this Court may take judicial notice of the fact that a blackjack player, rather than dealer, decides whether to request his own hit card, and a player's knowing silence or inaction when the dealer withholds a hit card could clearly be considered aiding or abetting in this regard.[4] This is particularly true when the evidence establishes, to the jury's satisfaction, that the parties were actively engaged in a criminal act at the time the hit card was withheld. Dumas' arguments in the present context would likely carry more weight if the jury had not found that he was guilty of defrauding the casino on several other counts as well. This Court concludes that the jury's convictions were based on legally sufficient evidence and should be affirmed.

**II. The trial court erred in allowing the jury to use a magnifying glass to view the videos given the State's assertion that the videos could be viewed without the assistance of any aid.**

¶18. Dumas next argues that the trial court erred in permitting the jury, over his objection, to use a magnifying glass to view the videotapes more closely. In support of this argument, Dumas cites *Collins v. State*, 701 So.2d 791, 794 (Miss. 1997), in which this Court reversed a conviction based on the trial judge's permitting the jury to bring a law dictionary into deliberations. This Court stated in *Collins* that:

> In our system of justice, every person charged with a crime is entitled to receive a fair trial before an impartial jury of his peers. Miss. Const. art. 3, § 26; U.S. Constitution amend. VI. A jury is to consider only the evidence developed at trial in determining its verdict. *Fuselier v. State*, 468 So.2d 45, 57 (Miss.1985) ("[A] jury's verdict must be based upon the evidence and not affected by extraneous influences."). A law book sent to the jury room, without proper precautions taken to ensure that the jury did not read from any inappropriate portions which would conflict with Mississippi law, is an extraneous influence upon a jury. As explained by a case on point in our sister state of Louisiana, "[t]he written word of a legal volume is more of an intrusion than a verbal communication because of its imprimatur of authority." *State v. Sinegal*, 393 So.2d 684, 686 (La.1981).

*Collins*, 701 So.2d at 794.

¶19. *Collins* is clearly distinguishable from the present case. A magnifying glass can not reasonably be considered an "extraneous influence" upon the jury, and other courts addressing this precise issue have permitted jurors to utilize magnifying glasses in their deliberations. *See, e.g., People v. Moody*, 600 N.Y.S.2d 581, 582 (N.Y. App. Div. 1993). A juror's use of a magnifying glass has properly been analogized to the use of glasses, and this Court finds no basis for reversal in this regard.

¶20. Dumas also briefly recites his unsuccessful argument before the trial court that the video was insufficiently clear and should not have been admitted. Dumas argues, without citing to authority, that:

> It's [sic] our position that given the question posed by the jury, that the foundation had not been laid sufficiently to - for the admissibility of said video and the video becomes irrelevant and immaterial.

This Court had held that the admissibility of videotapes, like admissibility of photographs, is within the sound discretion of the trial judge. *Berry v. State*, 703 So.2d 269, 278 (Miss. 1997); *McNeal v. State*, 551 So.2d 151 (Miss. 1989). While the videotape is not of the highest quality, this Court concludes that the tape is of sufficient clarity that the trial judge can not be said to have abused his discretion in refusing to exclude it. Moreover, as noted *supra*, we conclude that the videotape does depict activities which a reasonable juror could conclude are in violation of Miss. Code Ann. § 75-76-301 (Supp. 1999). The jury's verdict and judgment of the Coahoma County Circuit Court are affirmed.

¶21. **COUNT III: GAMING VIOLATIONS: SENTENCED TO (2) YEARS IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS & PAY A FINE OF $500.00 AFFIRMED.**

**COUNT VIII: GAMING VIOLATIONS: SENTENCED TO (1) YEAR IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS & PAY A FINE OF $500.00; SENTENCED IMPOSED SHALL BE CONSECUTIVE & SHALL COMMENCE AT THE TERMINATION OF THE SENTENCE IMPOSED IN COUNT III CAUSE NO. 9153 AFFIRMED.**

**COUNT X: GAMING VIOLATIONS: SENTENCED TO (1) YEAR OF POST-RELEASE**

**SUPERVISION, TO RUN CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT VIII OF CAUSE NO. 9153; PAY A SUPERVISORY FEE OF $25.00 PER MONTH TO THE DEPARTMENT OF CORRECTIONS AFFIRMED.**

**COUNT XI: GAMING VIOLATIONS: SENTENCED TO (1) YEAR OF POST-RELEASE SUPERVISION, TO RUN CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT X OF CAUSE NO. 9153; PAY A SUPERVISORY FEE OF $25.00 PER MONTH TO THE DEPARTMENT OF CORRECTIONS AFFIRMED.**

**COUNT XII: GAMING VIOLATIONS: SENTENCED TO (1) YEAR OF POST-RELEASE SUPERVISION, TO RUN CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT XI OF CAUSE 9153; PAY A SUPERVISORY FEE OF $25.00 PER MONTH TO THE DEPARTMENT OF CORRECTIONS AFFIRMED.**

**COUNT XV: GAMING VIOLATIONS: SENTENCED TO (1) YEAR OF POST-RELEASE SUPERVISION TO RUN CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT XII OF CAUSE 9153; PAY A SUPERVISORY FEE OF $25.00 PER MONTH TO THE DEPARTMENT OF CORRECTIONS AFFIRMED.**

**COUNT XVI: GAMING VIOLATIONS: SENTENCED TO (1) YEAR OF POST-RELEASE SUPERVISION, TO RUN CONSECUTIVE TO THE SENTENCE IMPOSED IN COUNT XV OF CAUSE 9153; PAY A SUPERVISORY FEE OF $25.00 PER MONTH TO THE DEPARTMENT OF CORRECTIONS AFFIRMED.**

**PITTMAN AND BANKS, P.JJ., SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

**McRAE, JUSTICE, DISSENTING:**

¶22. While the majority acknowledges that "the evidence of an intent to defraud on the part of Dumas is not overwhelming", it nevertheless affirms his conviction. The evidence presented at trial did not consist of any testimony proving there was a conspiracy between the dealer and Dumas or that Dumas was even aware that the dealer was improperly paying out. What did seem to convince the jury, and this Court, of Dumas's intent was the sole fact that the two knew each other but denied it when first questioned by casino security. That was not enough evidence to convict or for this Court to affirm that conviction. Accordingly, I must dissent.

¶23. The evidence presented at trial against Dumas was not only less than overwhelming, it was precarious at best. The State provided only three witnesses, none of whom were able to offer any testimony that Dumas was involved in any scheme to defraud the casino.

¶24. Michael Bush ("Bush"), a surveillance supervisor at Lady Luck, testified only to the actions of the dealer, not Dumas. As cited by the majority, Bush testified to the following violations:

Oh, overpayments, getting paid for hands that did not win, the dealer making his self [sic.] bust out, taking to many cards for his self [sic.] and paying - - and the dealer paying losing hands.

None of these violations involved Dumas; only the dealer.

¶25. The second witness, Clay Barnett, an employee of the Mississippi Gaming Commission, testified that he was called to the Lady Luck Casino on April 20, 1997, in order to investigate allegations that a dealer had been "dumping the game on blackjack." Barnett was not there to investigate Dumas or any of the other blackjack players that benefitted from the dealer's misconduct. Barnett further testified that Dumas informed him he knew nothing about any cheating taking place and even the dealer, Wells, maintained that Dumas had no part in it.

¶26. Last, the State called Nita Dumas-Wells, the sister of Dumas, who acknowledged that she was married to Tyrone Wells.

¶27. The State failed miserably in its case-in-chief. Using all of its resources, the State was only able to call three witnesses, none of whom implicated Dumas in any way. The evidence presented by these witnesses amounted to nothing more than a description of Dumas's family tree. The jury then convicted on merely a conjecture based on a relationship. The evidence presented by the State was "not overwhelming" to say the least.

¶28. When the dealer, Tyrone Wells, was questioned at Lady Luck Casino by an employee of the Mississippi Gaming Commission he admitted to his wrongdoing but maintained that Dumas had no part in it. The Court places too much emphasis on the fact that at first Dumas denied knowing Wells and allows that fact to overshadow the lack of any substantial evidence presented by the State. The Court also gives unwarranted deference to the fact that "The juror's close attention to the videotape is also evidenced by the fact that they returned "not guilty" and "guilty" verdicts with regard to different counts of the indictment which were worded exactly the same, except with regard to the time at which the videos were taken." Does this Court mean to say that because Dumas's "body language" was different on certain hands that he was aware of a conspiracy to defraud sometimes and at other times was completely in the dark? Without any further proof no reasonable juror could have found the defendant guilty of the crimes charged.

¶29. A close look at the video which was admitted in evidence and shown to the jury is still less than conclusive as to Dumas's intent to defraud Lady Luck Casino. If there were a conspiracy to defraud, there would have been a lot more going on than was depicted. A gambler who knows he will win generally bets more than a chip or two per hand. To convict Dumas for accepting winnings is akin to convicting a grocery shopper for unknowingly accepting too much change from the cashier after a purchase. While the dealer was in fact guilty in this case, there is no proof beyond a reasonable doubt to bind Dumas to his actions.

¶30. Further, although it is not raised as an issue in this case, the State erred in charging Dumas on individual counts for each hand. If anything, it is **one** transaction. Under the State's line of reasoning, a bank robber should be indicted separately for each individual dollar bill handed to him. We have never held such and should not do so in this case. It is all one transaction. It is not only malicious but just plain foolish to send a man to prison for 8 years under seven different indictments for only seven hands of blackjack. Since the State failed to meet its burden of proving guilt beyond a reasonable doubt, I would reverse and render. Accordingly, I dissent.

1. Some of the counts from the jury's indictment were only against Wells and another casino patron.

2. Some of the counts from the jury's indictment were only against Wells and another casino patron.

3. Each count referred to different "hands" of blackjack.

4. This is also true, albeit to a lesser extent, if the hit card which is being withheld is the hit card for the dealer's own hand. While the customer does not control whether the dealer "hits himself," the customer could be put on notice of improprieties if a dealer withholds any hit card in contravention of the rules of the game.