## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 91-DP-00353-SCT

*ROBERT SIMON, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/13/90 |
| TRIAL JUDGE: | HON. THOMAS H. PEARSON |
| COURT FROM WHICH APPEALED: | QUITMAN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOHNNIE E. WALLS, JR. |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| | CHARLENE R. PIERCE |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY |
| DISPOSITION: | AFFIRMED - 2/20/97 |
| MOTION FOR REHEARING FILED: | 4/14/95 |
| MANDATE ISSUED: | 3/10/97 |

**EN BANC.**

**PITTMAN, JUSTICE, FOR THE COURT:**

### ON MOTION FOR REHEARING

¶1. Motion for Rehearing is denied. The original opinions in this case are withdrawn and these opinions are substituted therefor.

### STATEMENT OF THE CASE

¶2. On February 3, 1990, in Clarksdale, Mississippi, Robert Simon, Jr. was arrested for the murders of Carl, Bobbie Joe, Charlotte and Gregory Parker. The February 2, 1990, murders were committed in the course of arson, robbery, burglary, sexual assault and kidnaping.

¶3. In March of 1990, Simon was charged by a Quitman County grand jury, in four separate indictments, with the capital murders of Carl, Bobbie Joe, Gregory and Charlotte Parker. In June of 1990, after a change of venue to Jones County, Simon was tried and convicted on the first indictment for the capital murder (committed in the course of arson, sexual battery and kidnaping) of Charlotte

Parker.[1] The district attorney dismissed the three remaining indictments. Later that month and during the June, 1990 term of the Quitman County Court, Simon was once more indicted by the grand jury for the capital murder in the course of robbery of Carl Parker; the capital murder in the course of burglary of Bobbie Joe Parker; and the capital murder in the course of kidnaping of Gregory Parker. While it was a single indictment, each of the three capital murders and underlying felonies were designated as separate counts.

¶4. Upon Simon's motion for change of venue from Jones County, the court transferred the cause to DeSoto County. On October 8, 1990, a jury was impaneled and the trial began. The trial continued through October 13, 1990, on which day the jury returned a verdict of guilty on each charge. The sentencing phase of the trial began on October 13, 1990, and on the same day, the jury sentenced Simon to death by lethal injection for each of the three counts.

¶5. In accordance with the jury's verdict and sentence, the trial judge set the date of December 5, 1990, for execution by lethal injection and ordered that Simon be transferred to the Mississippi Department of Corrections.

¶6. On November 12, 1990, Simon moved for a Judgment Notwithstanding the Verdict and/or New Trial. The trial court denied said motion on November 12, 1990.

¶7. On November 12, 1990, Simon perfected his appeal to this Court. Simon assigns twenty-two issues as error committed by the trial court. After full consideration of each assignment of error, we affirm both Simon's convictions and sentence to death by lethal injection on all three counts. During oral presentation and argument of the case sub judice, Simon argued only two issues, those being the issues related to voir dire of jurors and the venue of DeSoto County. These matters designated Issue I and II below are of primary concern and significance. Issues VII; VIII; XII, A, B, & D; and XX are procedurally barred. The claim based jury instructions S-4(A) regarding accomplice liability is procedurally barred. The Court hereafter speaks only to those issues meriting full discussion; however, each of the issues presented by Simon have been fully considered by this Court.[2]

> **I. THE LOWER COURT ERRONEOUSLY REMOVED FOR CAUSE AND PREVENTED DEFENSE VOIR DIRE OF SEVERAL JURORS WHO DID NOT INDICATE THAT THEIR VIEWS ON CAPITAL PUNISHMENT WOULD SUBSTANTIALLY IMPAIR THEIR ABILITY TO FOLLOW THE LAW.**

> **II. THE TRIAL COURT ERRED IN TRANSFERRING VENUE TO DESOTO COUNTY.**

> **A. THE TRIAL COURT'S DENIAL OF SIMON'S DEMAND TO BE TRIED IN QUITMAN COUNTY DEPRIVED HIM OF HIS SIXTH AMENDMENT RIGHT TO A TRIAL IN THE COUNTY WHERE THE ALLEGED OFFENSE OCCURRED.**

> **B. THE TRIAL JUDGE'S TRANSFER OF SIMON'S TRIAL FROM PREDOMINANTLY BLACK QUITMAN COUNTY TO VIRTUALLY ALL-WHITE DESOTO COUNTY RAISES AN INFERENCE OF RACIAL DISCRIMINATION WHICH THE STATE FAILED TO REBUT.**

**C. THE GROSSLY PREJUDICIAL PRETRIAL PUBLICITY THAT SATURATED DESOTO COUNTY, TOGETHER WITH THE TRIAL COURT'S REFUSAL TO APPROVE INDIVIDUAL SEQUESTERED VOIR DIRE, DEPRIVED SIMON OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL ON GUILT AND PUNISHMENT.**

**V. THE PROSECUTOR OFFERED A PATENTLY PRETEXTUAL EXPLANATION FOR HIS PEREMPTORY REMOVAL OF ONE OF THE ONLY TWO PROSPECTIVE BLACK JURORS IN THE QUALIFIED VENIRE.**

**VII. THE TRIAL COURT IMPROPERLY TOLD THE JURORS THAT SIMON'S STATEMENT WAS VOLUNTARY AND REFUSED TO INSTRUCT THE JURY THAT THEY COULD INDEPENDENTLY DETERMINE THIS ISSUE.**

**IX. THE TRIAL COURT ERRED IN ADMITTING A STATEMENT ALLEGEDLY MADE BY SIMON, WHICH WAS INVOLUNTARY, NOT PRECEDED BY A WAIVER OF HIS <u>MIRANDA</u> RIGHTS, AND OTHERWISE OBTAINED IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS.**

**XVIII. THE TRIAL COURT ERRED IN REFUSING TO ALLOW SIMON TO PRESENT RELEVANT MITIGATING EVIDENCE TO THE JURY AT THE SENTENCING STAGE.**

## <u>STATEMENT OF THE FACTS</u>

¶8. On February 2, 1990, sometime between 8:45 and 9:15 p.m., Carl Parker, his wife Bobbie Joe, and their two children Charlotte and Gregory, left the Riverside Baptist Church in Clarksdale, Mississippi, and returned to their home on Highway 322 in rural Quitman County, Mississippi.

¶9. Later that evening, around 11:00 p.m., Billy King, while driving on Highway 322, noticed a fire at the Parker home. King proceeded to the home and discovered a fire in the southwest corner of the home. King attempted to open the unlocked carport door, but was driven back by the smoke and flames. King then left and drove eastward to the home of D.L. Ivey, to call for help. King testified that while he did not pass any vehicles on the way to the neighbor's house, he did observe the taillights of two vehicles leaving the Parker's property from a road leading to the Parker's farm shop. That same night, Joe McCullough, while driving east on Highway 322, observed two vehicles traveling west towards Clarksdale. McCullough identified the first vehicle as a Chevrolet truck but stated that because of the speed of the vehicles, he was unable to identify the second vehicle. McCullough also stated that the two vehicles were tailgating closely and were traveling very fast, some 70 m.p.h.

¶10. Jerry Wages was the first fireman to arrive at the scene of the burning Parker home. Wages crawled into the house through the unlocked back door. When the other Lambert fire fighters arrived at the Parker home, they entered the home and subsequently discovered the bodies of Carl, Bobbie Joe, Gregory and Charlotte Parker. Jerry Wages pulled the body of Carl Parker from the burning home. Wages and the other firemen then went back into the house and recovered the bodies of Gregory and Charlotte Parker. Wages recalled that the bodies of Carl and Gregory were bound at the hands and at the feet. After the fire was extinguished, the body of Bobbie Joe, burnt beyond

recognition, was discovered in a bed in the southwest corner of the house. Wages also testified that he recalled seeing several items, including a television and a VCR, stacked up near the back door of the home.

¶11. Jack Harrison, Quitman County Sheriff, was called to assist in investigating the crime scene. Carl Parker's pickup truck was discovered missing and the police radioed this information to all neighboring authorities.

¶12. Sometime around midnight that same night, Eddie Spralls, a Clarksdale resident, heard noises and observed a truck being backed up between two houses.[3] Spralls called the police.

¶13. When the Clarksdale police arrived, the officers placed a spot-light on the truck. The officers observed two black men jump from the truck and run towards Highway 61. After running a VIN search on the abandoned truck, the police discovered that it belonged to Carl Parker. The truck was in the vicinity of Carrie Armstrong's home. Armstrong was Martha Simon's mother and Robert Simon's mother-in-law.[4] Several household items from the Parker home were found loaded in the back of the truck. Pillowcases containing other items, allegedly owned by the Parkers, were also found. Due to heavy rains that evening, all of these items were taken to a city garage in order for them to dry out.

¶14. In addition, a shotgun and a pillowcase containing two revolvers were discovered near the truck. One of the guns contained two live shells. Steve Byrd performed forensic and ballistic testing on the guns recovered. Byrd, an expert in the field of ballistics, testified that the projectiles removed from the bodies of Carl and Gregory Parker were fired from a .32-20 revolver and the projectile removed from the body of Bobbie Joe Parker was fired either from a .38 Colt revolver (found in the same location) or from a revolver with the same class characteristics. In addition, Mrs. Mamie Elmore, a Winona resident, identified Robert Simon as one of two men who had stolen the two guns from her less than a week before the murders were committed. The Clarksdale police relayed the information that a truck similar to the description of Carl Parker's was discovered in Clarksdale to the Quitman County Sheriff's Department.

¶15. Andrew Thompson, Jr., Sheriff of Coahoma County, testified that when he arrived at his office on Saturday morning, he received a call and obtained information concerning the Parker murders from a "female citizen."[5] Thompson then proceeded to Marks, Mississippi, to relay this information to the Quitman County Sheriff's Department. Thompson also testified that he later talked directly with Martha Simon (Robert Simon's wife) when she came to the Department. Thompson stated that this conversation led to the recovery of a pair of coveralls and work gloves from a locked dumpster, near Simon's mother-in-law's home. The coveralls were wet and the gloves smelled of smoke.

¶16. After collecting this evidence and relying on the information obtained, Sheriff Thompson once again relayed all the information to Quitman County's Sheriff Harrison. Harrison then obtained two arrest warrants in Marks, Mississippi. Simon was arrested around 3:30 p.m. on February 3, 1990. After being read his **Miranda** rights, he was placed in the Clarksdale city jail.

¶17. In addition, after getting permission from Martha Simon, the police, accompanied by Martha Simon, searched the Simons' leased apartment in Memphis, Tennessee. While there, the officers discovered several items, including a man and woman's wedding ring, a money clip, a pellet gun and a

notebook with "Mr. Parker" written inside. All of these items were allegedly owned by the Parkers and all were identified by Dean and Scott Parker during their testimony at trial. In addition, the woman's rings were identified by James Sanders, the jeweler who soldered them together for Bobbie Joe Parker. This evidence and testimony, along with the statement Simon gave to the police comprised the evidence put on by the State during the guilt phase of the trial.

¶18. On February 5, 1990, Simon was transferred to the Quitman County jail. Officer Dickerson read Simon his *Miranda* rights in the presence of Sheriff Harrison and Officer Ellis. Simon's statement was not recorded. However, all three officers present at the interview testified that, while Simon waived his rights as contained in the waiver, he preferred not to sign the waiver of rights. In addition, all three officers testified that Simon, as part of his statement, confessed that he had killed the Parker family.

¶19. At a pre-trial hearing, Simon sought to suppress his statement. Simon testified at length, contending that he did not voluntarily waive his rights because he was scared. Specifically, Simon stated that he requested an attorney and informed a jailer of this fact. However, he could not identify the jailer to whom he made this request. Several other witnesses testified at this hearing, including all the law enforcement officers, inmates housed at the jail and Martha Simon. Simon admitted that he made the statements to the officers, including the portion that he "killed the Parkers" but stated he "was scared and made most of it up."

¶20. Three inmates, A. J. Jones, Tommy Conley and Robert Brown, were housed in the Quitman County jail when Simon was brought in. They testified to statements they overheard Simon and Anthony Carr make while housed there.[6] Simon denied talking with Jones and Brown.

¶21. During the suppression hearing, the trial judge stated that he believed the statement given by Simon was freely and voluntarily given but reserved final ruling until hearing from Dr. William Kallman, the treating psychiatrist. After considering the preliminary report prepared by Dr. Kallman, the trial court ruled that the statement was admissible.

¶22. Dr. Steven Hayne performed all three autopsies in Jackson, Mississippi. Hayne testified that Carl, Gregory and Bobbie Joe Parker died from multiple gunshot wounds. Hayne also stated that the two guns comprising two of the exhibits, tested and confirmed his opinion that the weapons matched with the shells retrieved from the victims and labeled Exhibits 101 and 103.

## DISCUSSION OF THE LAW

### I. PRE-TRIAL PHASE

### I. DID THE LOWER COURT ERRONEOUSLY REMOVE FOR CAUSE AND PREVENT DEFENSE VOIR DIRE OF SEVERAL JURORS WHO DID NOT INDICATE THAT THEIR VIEWS ON CAPITAL PUNISHMENT WOULD SUBSTANTIALLY IMPAIR THEIR ABILITY TO FOLLOW THE LAW?

¶23. On appeal, Simon contends that the trial court committed reversible error by refusing to permit individual sequestered voir dire of certain venire members: Ms. Williams (juror 72); Ms. Massey (juror 91); Ms. Etheridge (juror 23); and Ms. Hinson (juror 104). Simon alleges that the responses

given by these venire members to certain questions pertaining to their respective ability to follow the law and impose the death penalty necessitated further inquiry. Simon argues that the trial court should have permitted the defense to question these jurors further in order to determine "whether they possessed convictions about capital punishment that would substantially impair their ability to follow the court's instructions to consider a death sentence." While the record indicates Simon's objection to these jurors being excused, it does not reflect a request for individualized voir dire of these four venire members. Simon relies on *Fuselier v. State*, 468 So. 2d 45 (Miss. 1985), and quotes the following as controlling authority:

> [T]he fact that they would be hesitant to inflict the death penalty in a case based solely on circumstantial evidence does not constitute grounds to excuse them for cause. . . . Absent a clear showing that the prospective jurors would be unable to follow the court's instructions and obey the juror's oath, that juror's feelings regarding the death penalty do not constitute grounds for a challenge and the granting of such a challenge is reversible error.

*Id.* at 54-55.

¶24. We note the opinion further states that "it is completely understandable how jurors who are fully capable of following the court's instructions and juror's oath would be led to a hesitancy to state that they can impose the death penalty." *Id.* at 55.

¶25. Voir dire is conducted pursuant to Rule 5.02 of the Miss.Unif.Crim.R.Cir.Ct.Prac. (1992), which provides:

> In the voir dire examination of jurors, the attorney shall direct to the entire venire questions only on matters not inquired to by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge a particular verdict will be asked.

¶26. This Court has determined that Rule 5.02 permits a circuit court, in its discretion, to utilize individualized, sequestered voir dire. *Russell v. State*, 607 So. 2d 1107, 1110 (Miss. 1992) (citing *Jones v. State*, 461 So. 2d 686, 692 (Miss. 1984)); *Hansen v. State*, 592 So. 2d 114, 116 (Miss. 1991), *cert. denied*, 118 L. Ed. 2d 590, 1992 U.S. LEXIS 2882, 112 S. Ct. 1970, 60 U.S.L.W. 3781 (1992). This Court in refining the above enumerated standard has also stated that Rule 5.02 does not require more than what it states on its face. *Russell*, 607 So. 2d at 1110; *Hansen*, 592 So. 2d at 126; *White v. State*, 532 So. 2d 1207, 1218 (Miss. 1987); *West v. State*, 463 So. 2d 1048, 1054 (Miss. 1985).

¶27. Likewise, a district attorney's examination during voir dire should be abstract as opposed to what the juror might or might not do in the particular case at bar. *Williams v. State*, 544 So. 2d 782, 784 (Miss. 1987); *Murphy v. State*, 246 So. 2d 920, 921 (Miss. 1971); *McCaskill v. State*, 227 So. 2d 847, 852 (Miss. 1969); *Phenizee v. State*, 180 Miss. 746, 178 So. 579, 582 (1938).

¶28. The line between a proper and improper question is not always easily drawn; it is manifestly a process in which the trial judge must be given a considerable discretion. *Harris v. State*, 532 So. 2d 602, 606 (Miss. 1988); *Murphy v. State*, 246 So. 2d 920, 922 (Miss. 1971).

¶29. "Prospective jurors in capital cases may only be excluded for cause based upon their views on capital punishment when those views would 'prevent or substantially impair the performance [their] [sic] duties as juror[s] in accordance with [their] instructions and oath.'" *Williamson v. State,* 512 So. 2d 868, 880-81 (Miss. 1987) (quoting *Wainright v. Witt,* 469 U.S. 412, 424, 105 S. Ct. 844, 852, 83 L.Ed.2d 841, 851-52 (1985); *Gray v. Mississippi*, 481 U.S. 648, 107 S. Ct. 2045, 2051-52, 95 L.Ed.2d 622 (1987)). As a juror's bias against the death penalty does not have to be proven with unmistaken clarity, the decision of whether of not to excuse the juror is left to the trial judge's discretion. *Stringer v. State,* 500 So. 2d 928, 943 (Miss. 1986). The juror need not expressly state that he absolutely refuses to consider the death penalty; an equivalent response made in any reasonable manner indicating the juror's firm position will suffice. *Willie,* 585 So. 2d at 673; *Williamson,* 512 So. 2d at 881. Due to the trial judge's presence during the voir dire process, he is in a better position to evaluate the prospective juror's responses. *Williamson,* 512 So. 2d at 881. Finally, the determination of whether a juror is fair and impartial is a judicial question, and will not be set aside unless such determination is clearly wrong. *Carr v. State,* 555 So. 2d 59, 60 (Miss. 1989); *King v. State,* 421 So. 2d 1009, 1016 (Miss. 1982), *cert. denied*, 461 U.S. 919 (1983).

¶30. In the case sub judice, the defense raised objection to the aforementioned potential jurors (Ms. Williams, juror 72; Ms. Massey, juror 91; Ms. Etheridge, juror 23; and Ms. Hinson, juror 104) being excused for cause based on each one's opposition to the death penalty. We find nothing in the record evidencing Simon's actual request for individualized voir dire for these potential jurors. At the beginning of voir dire, the prosecution asked the entire venire whether any member was opposed to the death penalty for personal or religious reasons. Several members responded and raised their hands. Subsequently during voir dire, each of the venire members who had earlier objected to the imposition of the death penalty were individually questioned by the court, the State, and the defense, concerning their beliefs and views about the death penalty. Furthermore, the record reflects that each of the four venire members affirmatively stated that they were opposed to the death penalty, would not consider the death penalty, and would not impose it.[7] The trial court in considering the challenges for cause pertaining to these potential jurors overruled Simon's objection, relying on the fact that each of the four stated that they could not and would not consider the death penalty.

¶31. Simon relies on *Gray v. Mississippi*, 481 U.S. 648 (1987), wherein the United States Supreme Court held that the harmless error analysis is not applicable to jurors excused for cause based on their opposition to capital punishment. *Id.* at 664-65. The Court determined that it was reversible error for the trial judge to excuse a potential juror for cause when the juror was initially opposed to the death penalty, but later stated she could consider it in an appropriate case. In the present case, the record reflects that the jurors excused for cause did not later state that they could or would even consider the death penalty.

¶32. The State in its argument, relies on the cases of *Adams v. Texas*, 448 U.S. 38 (1980), and *Wainwright v. Witt*, 469 U.S. 412 (1985), as authority. The *Adams-Witt* standard was adopted by this Court in *Balfour v. State,* 598 So. 2d 731, 755 (Miss. 1992), and *Hansen v. State*, 592 So. 2d 114, 128 (Miss. 1991), *cert. denied*, 118 L. Ed. 2d 590, 1992 U.S. LEXIS 2882, 112 S. Ct. 1970, 60 U.S.L.W. 3781 (1992). In both *Balfour* and *Hansen*, this Court considered the holding of *Witherspoon v. Illinois*, 391 U.S. 510 (1968). The *Witherspoon* line of cases establishes the general proposition that a "juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as

a juror in accordance with his instructions and his oath." ***Adams v. Texas***, 448 U.S. 38, 45 (1980) (reaffirmed in ***Wainwright v. Witt***, 469 U.S. 412, 424 (1985)).

¶33. Stated another way, a prospective juror merely stating general objections or expressing conscientious or religious scruples against inflicting the death penalty is not enough for that juror to be excused for cause. ***Willie v. State***, 585 So. 2d 660, 672 (Miss. 1991) (citing ***Witherspoon v. Illinois***, 391 U.S. 510, 522 (1968)). If a juror who is opposed to the death penalty indicates that, if convinced of a defendant's guilt, he could return a verdict of guilty which might result in the death penalty, then the juror cannot be struck from the jury. ***Willie***, 585 So. 2d at 672-73. However, if a prospective juror is irrevocably committed to vote against the death penalty regardless of the facts and circumstances, then the prospective juror can be struck from the jury. ***Witherspoon***, 391 U.S. at 522, n.21; ***Williamson v. State***, 512 So. 2d 868, 881 (Miss. 1987).

¶34. This Court recognizes that it is often difficult for a juror to express in precise terms his or her feelings about, understanding of, and willingness to impose the death penalty. This difficulty of verbally expressing such views, of course, makes the interpretation of the juror's voir dire extremely difficult. We, therefore, look to not only the ruling but the setting and time devoted to the questions, and the opportunity of sequestered voir dire. Finally, we also examine and consider the overall care and concern given to developing the issues to be determined by the voir dire. The record in the present case reflects the State's concerns with these jurors serving in a capital case and fully supports the trial court's removal of these venire members.

¶35. In addition, Simon in a footnote raises as error the court's removal of Vicki Davis, over defense objection, when Davis stated that she had to leave court at 6:15 p.m. the day jury selection was taking place. Simon provides no authority for challenging this dismissal and the record clearly indicates that the trial court closely examined Davis' need to leave. It was after 6:00 p.m. when Davis requested permission to leave and the court dismissed her at 6:10 p.m. so that she would have ample time to drive home and administer a shot to her grandmother.

¶36. In reviewing each excusal for cause, it is readily apparent that the trial court was careful and cautious in exercising the court's discretion and did not abuse that discretion in removing these members from the venire. There is no merit to this issue and we therefore affirm.

### II. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN TRANSFERRING VENUE TO DESOTO COUNTY?

### A. DID THE TRIAL COURT'S DENIAL OF SIMON'S DEMAND TO BE TRIED IN QUITMAN COUNTY DEPRIVE HIM OF HIS SIXTH AMENDMENT RIGHT TO A TRIAL IN THE COUNTY WHERE THE ALLEGED OFFENSE OCCURRED?

¶37. Prior to Simon's second trial and after he was convicted and sentenced in Jones County, Simon moved for a change of venue from Jones County. The trial court granted Simon's request and ordered the change to DeSoto County. Once in DeSoto County, and one week prior to the commencement of trial, Simon moved again for a change of venue, stating that: (1) DeSoto County was not racially comparable to Quitman County -- where the crimes occurred; and (2) there was a disproportionate amount of pre-trial publicity in the area. However, Simon's motion was not heard at this time, as Simon failed to attach the requisite affidavit. During the first day of trial and immediately prior to voir

dire, Simon moved again for a change of venue to Quitman County, this time including a sworn affidavit. After a lengthy discussion of this matter, the trial court gave an extensive ruling and denied Simon's second request for change of venue. In part the trial court held:

> [O]riginally, there was a change of venue motion from Quitman County to some other County, and when that motion was filed, the Court did grant it based on the allegations that because of the widespread publicity in Quitman County and because of the close proximity of this to all citizens of Quitman County, there was a strong likelihood that the defendant could not receive a fair and impartial jury in that County. The Court concurred with that and granted the motion. The Court still concurs with that. I think it goes without saying if it was true then, it's true now, and nothing that has transpired in the meantime has changed it. Quitman County, in the opinion of this Court, is not the appropriate place to try this case. Based on that, the Court did grant the motion and changed venue to this County, DeSoto County, Mississippi. DeSoto County has the facilities for handling cases of this sort, that's something the Court has to look for.

> . . . The Jackson papers were -- certainly go throughout the state, the Commercial Appeal goes throughout at least a northern portion of the state and into certain parts of the southern portion, the coastal newspapers, another local newspaper such as the Laurel Leader Call, the Hattiesburg papers and the Meridian papers and we were trying this case in Jones County, which is about half way in between the -- well, Laurel is about half way in between Hattiesburg and Meridian, certainly they're close, their radio station services the same area.

> Frankly, there's no area in the State of Mississippi that the Court feels would be totally without coverage by these various news media. I don't believe that, generally speaking, the people in DeSoto County have had any more coverage than the people say in Bolivar County or Hinds County or Jones County or Humphreys County or Jackson County. This has been a highly publicized case, it will continue to be. . . .

> The Court recognizes that it is a constitutional right to be tried in the County of your -- where the case is based and where the Defendant is a resident, but in this case, the Defendant waived that when he asked for a change of venue and the Court concurred and thought the reason was correct. . . . In this case, it's been waived and not unwaived and there was a real basis for it, faction basis that this Court acted on.

> . . . I do not believe there's any guarantee under the Constitution or any other law of any sort that guarantees a particular racial composition to any jury. I believe that there is such -- I do not believe that there is such. When you ask for a change, you're asking for a change to persons who are not connected, who have no reason to be prejudiced or favor one side or the other, they're not close enough to it. We don't really know what the persons in the jury, potential jury here in DeSoto County will say. We do know that we couldn't tell until we question them about their feelings about this case one way or the other. . . .

> As far as information is concerned that's contained in the newspapers, particularly since the Carr trial, certainly the Carr trial received publicity. The first Simon trial received extensive publicity, conceivably not as much as the Carr trial, but certainly enough to be well known throughout this state, this area, any part of the state you go to. I think it will be covered just about as well as the other.

A lot of information that was released to the general public was released under the order of the Mississippi Supreme Court when they declared that all the information from the Carr trial would be released after his jury was seated, and the Court had full knowledge that these were co-defendants, that the same evidence, the same publicity, the same witness to a great extent, everything was the same in these two cases. I would assume the Mississippi Supreme Court knew what would happen when that information was released, I would hope so. This Court made every effort to see that these files were closed and kept closed, and it was at the motion of the Defense, and the Court preferred to go with the newspapers. . . .

. . . At any rate the Court does not feel that changing venue back to Quitman County would be appropriate. The Court does feel until shown otherwise that DeSoto County will be as good a place to try this case as any other place, frankly better as far as the Court can see or it wouldn't have brought it here to begin with, certainly because of the availability of facilities, personnel, the willingness of them to try it, the availability of the courthouse and the convenience of all persons concerned.

As I stated, I do not feel that there's any reason to think that we have to guarantee any particular makeup of any particular jury. The same argument was made in Jones County. I think Jones County was approximately the same -- maybe the same makeup as DeSoto County. I believe the claim has been made that DeSoto was somewhere between 20 and 25 percent; Jones County was something about that. We did have two black jurors and the defendant did not received the death penalty as everyone knows.

I do not know what will happen in DeSoto County. it always depends on how the jury falls and who's drawn and that's by -- under the laws of the State of Mississippi and the United States government, they require that they be done at random. We have no control over that and don't want to have any control.

The Court's rule, as far as the change of venue is concerned, feels like it's been made, it's appropriate that it stay here, should not be moved back to Quitman County, and the Court's rule of that portion of the motion is denied.

And with regard to a continuance, the Court feels there has certainly been publicity about this case, there was publicity about this case when we transferred the first of the trials in this case for the four charges against Mr. Simon to Jones County, a claim was made that immediately that would bring on publicity in Jones County and it did, and the same thing has happened wherever it's been, and it's been the same rehash of what has taken place every time. The press has seen fit to quote everything about this case that they could remember from the beginning to the end. As stated, this Court has made every effort to have as little publicity about this case and as little prejudicial publicity about it as it possibly could, and it was not through the efforts of the Defense of the Court or the State that this was not always carried out. I don't think that anything would be availed by postponing the case. As soon as it was announced it was going to be tried next December or whenever we might set it, the same publicity would be extant again or continue to be extant. It's a prominent case, it has always been and will continue to be as long as it's around to be tried, and the only thing this Court knows is to go ahead with the case and complete it, . . .

¶38. On appeal to this Court, Simon characterizes his second motion for change of venue as a "conditional" motion to change venue, conditioned on the right to be tried in the county where the offense occurred in the event the trial court moved the cause to a county less favorable than Quitman County. Simon argues that because the racial composition of DeSoto County was 83.2% white and 15.2% black, it was improper and reversible error for the court to move the cause to that county. Simon argues that because DeSoto County was only 40 miles from where the crimes occurred and that DeSoto County was saturated with pre-trial publicity that he should have been tried in Quitman County, the county where the offenses occurred even though it, too, had been saturated with the same publicity, because Quitman County's racial composition was more closely aligned. (Quitman County's population was 53.6% black and 45.1% white).

¶39. Simon, as part of his appeal in *Simon v. State*, 633 So. 2d 407 (Miss. 1993), *vacated on other grounds*, *Simon v. Mississippi*, 115 S.Ct. 413, 130 L.Ed.2d 329, 63 U.S.L.W. 3346 (U.S.Miss. Oct. 31, 1994) (hereinafter referred to as *Simon I*), argued that it was error for the trial court to deny his motion for a second change of venue. Prior to Simon's trial in *Simon I*, on the indictment for the capital murder (committed in the course of arson, sexual battery and kidnaping) of Charlotte Parker, he moved for and was granted a change of venue from Quitman County to Jones County. During the course of trial, Simon objected to the specific venue of Jones County. Simon contended that Jones County with 21% of the registered voters being black was not racially comparable to Quitman County with 54% of the registered voters being black. On this basis, Simon requested a second change of venue, which the trial court denied. Simon was tried, convicted and received sentences of 30 years for sexual battery, 30 years for kidnaping and a life sentence for murder in Jones County. On appeal, this Court addressed Simon's second motion for change of venue, stating that:

> The Sixth Amendment to the Constitution of the United States provides for a trial by an impartial jury. However, as we noted in *Britt v. State*,
>
> Although the defendant does have a right to be tried by a jury whose members were selected pursuant to a nondiscriminatory criteria, the *Batson* court noted that the Sixth Amendment to the Constitution of the United States has never been held to require that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the populations.

*Simon v. State*, 633 So. 2d at 412.

¶40. "The right to a fair trial by an impartial jury is fundamental and essential to our form of government. It is a right guaranteed by both the federal and state constitutions." *Johnson v. State*, 476 So. 2d 1195, 1209 (Miss. 1985) (citing *Adams v. State*, 220 Miss. 812, 72 So. 2d 211 (1954)). "The accused has a right to a change of venue when it is doubtful that an impartial jury can be obtained; such doubt is implicit when there is strong public sentiment against the defendant. . . ." *Johnson*, 476 So. 2d at 1210-11.

¶41. At first glance, it appears that Simon was "forum-shopping." The question on appeal is not whether the trial court erred in granting the change of venue motion, but rather whether the trial court erred in granting the motion and moving the case to DeSoto County, a county where the racial composition was disproportionate to that of Quitman County. In other words, should the trial court have moved the trial (a second time) to a county with a similar racial composition to that of Quitman

county. We look again to this Court's decision in *Simon I*, wherein Chief Justice Hawkins wrote: "Simon cites no cases to support his contention he was entitled to a second change of venue to a county with a population similar to Quitman County. Indeed the United States Supreme Court declined to make such a requirement incumbent on the states in the case of *Mallett v. Missouri*, 769 S.W.2d 77 (Mo. 1989), *cert. denied* 494 U.S. 1009, 110 S. Ct. 1308, 108 L.Ed.2d 484 (1990)." *Simon I*, 633 So. 2d at 412.

¶42. It is well-established in our jurisprudence that "the granting of a change of venue is a matter so largely in discretion [sic] of the trial court that a judgment of conviction will not be reversed on appeal on the ground that a change of venue was refused, unless it clearly appears that trial [sic] court abused its discretion." *Billiot v. State*, 454 So. 2d 445, 454 (Miss. 1984) (quoting *Parks v. State*, 267 So. 2d 302, 304 (Miss. 1972)), *cert. denied*, 469 U.S. 1230 (1985). This Court later refined this discretionary standard in *Fisher v. State*:

> We have repeatedly held that the matter of whether venue should be changed in a criminal proceeding is committed to the sound discretion of the trial judge. See, e.g., *Winters v. State*, 473 So. 2d 452, 457 (Miss. 1985); *Cabello v. State*, 471 So. 2d 332, 339 (Miss. 1985); *West v. State*, 463 So. 2d 1048, 1053-54 (Miss. 1985); *Billiot v. State*, 454 So. 2d 445, 454 (Miss. 1984). A corollary premise is that we will not reverse for failure to grant a change of venue unless the trial judge has abused his discretion.
>
> We have repeated these notions so often in recent years that we have tended to overlook that the venue decision is committed to the trial court's sound discretion, not his unfettered discretion. . ..
>
> The sound exercise of the discretion vested in the trial judge when faced with a motion for change of venue must be informed by the evidence presented at the venue hearing coupled with the trial judge's reasoned application of his sense of the community and, particularly in a case such as this, an awareness of the uncontrovertible impact of saturation media publicity upon the attitudes of the community. . . . A venire drawn from a fair-cross section of the community in theory and in fact is supposed to, and generally will, represent that community and reflect the biases and prejudices of that community-as every judge and lawyer who has ever picked a jury well knows.

*Fisher v. State*, 481 So. 2d 203, 215 (Miss. 1985).

¶43. The *Simon* cases generated an enormous amount of publicity throughout the State of Mississippi. It is unlikely that a change of venue to other areas in this State would have resulted in a venire comprised of members who had not heard about the case in some form or fashion. The venire chosen in DeSoto County was thoroughly examined and questioned about whether they had been exposed to any form of publicity. The venire was questioned about their amount of exposure to any of the various forms of publicity. In addition, if any member was exposed, they were also questioned about whether such publicity would influence or affect their impartiality. The linchpin is whether the venire members stated that they could be fair and impartial jurors if chosen. *See King v. State*, 421 So. 2d 1009, 1016 (Miss. 1982), *cert. denied*, 461 U.S. 919 (1983); *Armstrong v. State*, 214 So. 2d 589, 593 (Miss. 1968), *cert. denied*, 395 U.S. 965 (1969). The record reflects that each of the impaneled jury members affirmatively stated that they could serve as fair and impartial jurors.

¶44. As the trial court did not abuse its discretion in granting Simon's second motion for a change of venue and moving the cause to DeSoto County, we affirm.

### B. DID THE TRIAL JUDGE ERR IN REFUSING SIMON'S REQUEST FOR INDIVIDUAL VOIR DIRE?

¶45. There was no occasion where Simon requested individual voir dire and was denied. The trial judge conducted a general voir dire of jurors.

¶46. The trial court asked the entire venire several questions surrounding the extent of pre-trial publicity and specifically asked the prospective jurors whether they could be fair and impartial jurors. There was an announcement by the court and seemingly an understanding by all parties that individual and sequestered voir dire would be held in chambers for those venire members answering affirmatively to questions concerning exposure to the various forms of publicity. Indeed, the record reflects that certain veniremen were called into chambers for individualized questioning. Mr. Dennis and Mr. Wilkes were both brought into chambers for further examination of their views and about their respective ability to serve as fair and impartial jurors.

¶47. This Court, in *Hansen v. State*, 592 So. 2d 114, 126 (Miss. 1991), *cert. denied*, 118 L. Ed. 2d 590, 1992 U.S. LEXIS 2882, 112 S. Ct. 1970, 60 U.S.L.W. 3781 (1992), held that a "circuit court may in its discretion allow individualized and sequestered voir dire."

¶48. Simon, as he did in *Simon I*, his prior appeal, argues that because of the vast amount of pre-trial publicity, there was a need for individualized and sequestered voir dire. Simon contends that he was denied a fair trial because the trial court failed to conduct individualized and sequestered voir dire pursuant to Rule 5.02 of the Mississippi Uniform Criminal Rules of Circuit Court Practice. Simon further contends that because of the publicity, the court erred in accepting at face value the answers and assurances of the venire. In support Simon relies on *Fisher v. State*, 481 So. 2d 203, 222 (Miss. 1985), wherein this Court held that "the trial judge further erred in accepting at face value the assurances of then jurors impaneled that they could ignore what they heard . . ." *Id.* at 222. (emphasis added) Therefore, this Court determined that Fisher was unable to receive a fair trial because of the publicity and "venue of this case should have been transferred to a county substantially outside the coverage area." *Id.* at 223. The record in the present case reflects that the venire was thoroughly questioned by both a pre-trial questionnaire and examination once in the courtroom. The record further supports the fact that none of the jurors impaneled, when asked during voir dire, stated that the media coverage would impair their ability to be fair and remain objective. Further, the record reflects that only four of the jurors for this case responded affirmatively that they had heard, read or seen this case discussed in the papers and on television.

¶49. The State submits that the issue of whether a juror can be fair and impartial is the primary focus and can be determined without sequestration. The State cites *Mu'Min v. Virginia*, 500 U.S. 415 (1991), wherein the petitioner was convicted of murder and sentenced to death. In *Mu'Min*, there was an extensive amount of publicity surrounding the trial. While eight of the twelve jury members who served, affirmatively answered that they had either read or heard something about the case, all of the jury members said that they had not formed an opinion about the case. Further, they stated that what they had read or heard would not affect their ability to perform their duties as jurors in the case.

*Mu'Min*, 500 U.S. at 419-20.

¶50. The petitioner *Mu'Min* alleged that his Sixth and Fourteenth Amendment rights were violated when the trial court refused to further question certain jurors about the specific contents of what they read or heard. The United States Supreme Court held that questions pertaining to the content of pre-trial publicity to which a juror had been exposed is not constitutionally required. *Id.* at 425. The Court stated that "such questions are constitutionally required only if the trial court's failure to ask such questions renders the defendant's trial fundamentally unfair." *Mu'Min*, 500 U.S. at 426 (citation omitted). The Court also noted that trial courts are given a wide range of discretion in conducting voir dire in the area of pre-trial publicity. *Id.* at 427.

¶51. After considering all the evidence, we find that the trial court did not commit reversible error, as certain venire members were subject to individualized and sequestered voir dire. This issue is without merit, and we therefore affirm.

### C. DID THE TRIAL JUDGE'S TRANSFER OF SIMON'S TRIAL FROM PREDOMINANTLY BLACK QUITMAN COUNTY TO VIRTUALLY ALL-WHITE DESOTO COUNTY RAISE AN INFERENCE OF RACIAL DISCRIMINATION WHICH THE STATE FAILED TO REBUT?

¶52. Simon contends that because the trial was moved to a predominantly white county, he was denied a trial by a fair and impartial jury.

¶53. The Sixth Amendment to the Constitution of the United States mandates that all defendants receive a trial by an impartial jury. In *Britt v. State*, 520 So. 2d 1377 (Miss. 1988), Appellant claimed that he was denied a fair trial as there was not a cross-section of his community present in the seated jury. Appellant also alleged that the State systematically excluded men as jurors. This Court held that "[a]lthough the defendant does have a right to be tried by a jury whose members were selected pursuant to a non-discriminatory criteria, . . . the Sixth Amendment . . . has never been held to require that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Britt*, 520 So. 2d at 1379 (*citing Taylor v. Louisiana*, 419 U.S. 522 (1975)).

¶54. Furthermore, in *Lanier v. State*, 533 So. 2d 473 (Miss. 1988), this Court outlined the elements necessary to establish a prima facie violation of the fair cross-section requirement for an impartial jury:

    1) the group alleged to be excluded is a "distinctive" group in the community;

    2) the representation of this group in vineries from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

    3) this under representation is due to systematic exclusion of the group in the jury selection process.

*Lanier,* 533 So. 2d at 477 (*quoting Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

¶55. Case law supports the State's argument that Simon was not entitled to a racially comparable jury

and that there was no showing of "systematic exclusion." The impaneled jury was comprised of 12 females, 1 black and 11 white. The three alternates were also females and were all white.

¶56. Furthermore, the facts demonstrate that: (1) the clerk of the court drew the venire in random fashion; (2) the black voter registration for DeSoto County was in the area of 15% and therefore 9 of the 105 members being black is considered a fair representation; and (3) Simon failed to show or offer any evidence that the State engaged in systematic exclusion of a particular race.

¶57. Our case law is clear in that there is no constitutional right to be tried by a jury that absolutely mirrors any particular community. Simon alleges that the trial, if not moved to a racially comparable county, should have been moved back to Quitman County. However, the fact that he now complains of prejudice because of the proximity of DeSoto County to the crime scene is without merit. A defendant's motion for a change of venue effectively waives his right to be tried in the county where the crimes occurred. *See* Miss. Const. Art. 3, § 26 (1890).

¶58. Upon closer examination of Simon's argument, it appears Simon wanted the both of best worlds: if he could not move the case from Jones County to a county that he approved of, he wanted the case heard in the county where the offense occurred, and Simon did not attempt to withdraw the motion until the court had acted on this motion by granting the change of venue. The Court notes that the same strategy was attempted in *Simon v. State*, 633 So. 2d 407 (Miss. 1993), *vacated on other grounds*, *Simon v. Mississippi*, 115 S.Ct. 413, 130 L.Ed.2d 329, 63 U.S.L.W. 3346 (U.S.Miss. Oct. 31, 1994), (*Simon I*). However, we hold that Simon waived his right to be tried in Quitman County when he first moved for the change of venue. In addition, Simon wanted the case moved to a court where there had been little to no pre-trial publicity. The trial court commented on the vast publicity generated by both the Simon and Carr trials and that such publicity saturated the majority of, if not the entire State. It would have been a difficult task for the trial court to move the case to a county in this State that had not been exposed to a fair amount of media coverage.

¶59. The record discloses that the trial court sufficiently guarded against empaneling a biased jury. Therefore, this issue is affirmed.

### D. DID THE PRETRIAL PUBLICITY, TOGETHER WITH THE TRIAL COURT'S REFUSAL TO APPROVE INDIVIDUAL SEQUESTERED VOIR DIRE, DEPRIVE SIMON OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL ON GUILT AND PUNISHMENT?

¶60. Simon was never denied any sequestered voir dire that he requested. Simon's argument pertaining to the trial court's refusal to allow individual sequestered voir dire has been previously addressed within assignment I and assignment II, part B. Therefore, this discussion is limited to Simon's argument surrounding the change of venue based solely on the pre-trial publicity.

¶61. In each of Simon's trials, there was a change of venue granted due to the publicity generated from the case. In *Simon I* from Quitman County to Jones County and in the present case from Jones County to DeSoto County. This Court held in *Simon I*, "Simon's motion for a change in venue because of wide-spread publicity generated by this case was granted. Nothing in our constitutions, statutes, or case law gives a criminal defendant the right to obtain a venue of his choosing by making repeated motions for a change of venue." *Simon v. State*, 633 So. 2d at 412. As the same reasoning

is applicable to Simon's present appeal, this issue is without merit and is therefore affirmed.

## V. DID THE PROSECUTOR OFFER A PATENTLY PRETEXTUAL EXPLANATION FOR HIS PEREMPTORY REMOVAL OF ONE OF THE TWO PROSPECTIVE BLACK JURORS FROM THE QUALIFIED VENIRE?

¶62. Simon, a black male, was convicted by a jury comprised entirely of women, both black and white. Of the twelve members, one was a black citizen. The three alternates, all white, were also women. Simon challenges the trial court's findings pertaining to the State's use of a peremptory challenge to remove venire member, Ms. Annie Jamison (number 19).

¶63. During the course of juror selection, Simon objected to the State's peremptory challenge of Jamison and alleged that the prosecution violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by improperly striking Jamison, "one of the only two black venire members."[8] The State in response to the defense's *Batson* assertion, offered the following reasons for removing Jamison: (1) the State earlier accepted number 26, a black; (2) Jamison looked intimidated when the State discussed the black-on-white nature of the crime and also stated that she looked intimidated when Walls asked whether the race situation would affect the jury; and (3) Jamison had two young children and a blind grandmother to care for while her husband worked the midnight shift.

¶64. The trial court was satisfied that the State provided a racially neutral reason to justify its challenge, and as such overruled the *Batson* objection, stating systematic exclusion had not been demonstrated by the exercise of a peremptory against Jamison. Simon challenges this determination, stating that the State offered a "patently pretextual reason for the strike." The State counters this assertion stating that: (1) Simon failed to make out a prima facie showing of purposeful discrimination; (2) the prosecutor was nonetheless required to offer a race neutral reason for the challenge; and (3) even if a prima facie showing had been made, the State's proffered reasons for the strike were sufficient, race-neutral reasons under the law.

¶65. The United State Supreme Court, in considering *Batson v. Kentucky*, set forth a three-prong test to be used in establishing a prima facie case of purposeful discrimination in jury selection:

> To establish such a case, the defendant must first show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire, members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude that veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

*Batson*, 176 U.S. at 35 (citations omitted).

¶66. Mississippi in adopting the test set forth in *Batson*, recognized the importance of credibility issues raised by a Batson challenge and has elaborated further stating:

We today follow the lead of other courts who have considered this issue and hold that a trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are to be given **great deference and will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence**.

*Lockett v. State*, 517 So. 2d 1346, 1340 (Miss. 1987) (emphasis added), *cert. denied*, 487 U.S. 1210 (1988).

¶67. In addition to this Court's holding concerning the *Batson* test, the *Lockett* opinion included an appendix containing numerous examples of acceptable "race-neutral" reasons which the prosecution could assert in justifying the use of its peremptory challenges. *Id.* at 1356.

¶68. As Simon is black and the State challenged a prospective black juror, the first two prongs of the *Batson* test are satisfied. The remaining hurdle required by the test is a showing of intent on the part of the State to use its peremptory challenges for the purpose of excluding minorities. "As long as the trial court was within its authority when it determined that the State articulated a 'neutral non-race based explanation', we will not reverse." *Willie v. State*, 585 So. 2d 660, 672 (Miss. 1991) (*quoting Chisolm v. State*, 529 So. 2d 635, 639 (Miss. 1988)). The trial courts of this State are afforded a great deal of deference by this Court in their findings of fact surrounding a *Batson* challenge. *Willie*, 585 So. 2d at 1283.

¶69. The trial court was satisfied that the State offered a racially neutral reason for its challenge against Jamison; she had numerous other responsibilities in caring for family members. The trial court's ruling that the defense failed to show systematic exclusion on the part of the State comports with the holdings set forth in *Willie* and *Lockett*. This decision on the part of the trial court should not be viewed as "clearly erroneous or against the overwhelming weight of the evidence." *Lockett*, 517 So. 2d at 1349-50. Furthermore, "great deference" should be given to the trial court's findings as these "findings turn largely on credibility." *Lockett*, 517 So. 2d at 1350; *Willie*, 585 So. 2d at 672.

¶70. The reasons offered by the prosecutor, together with the trial court's ruling, does not rise to the level of being clearly erroneous. Therefore, we hold that no reversible error resulted in the State's exercising a peremptory challenge against Annie Jamison.

## II. GUILT PHASE

### VII. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR CONCERNING SIMON'S STATEMENT BEING VOLUNTARY AND IN REFUSING TO INSTRUCT THE JURY THAT THEY COULD INDEPENDENTLY DETERMINE THIS ISSUE?

¶71. Prior to trial and after an extensive suppression hearing, the trial court ruled that the statement Simon gave to law enforcement in the Quitman County jail would be admissible at trial. "On the issue of whether a defendant's confession was made voluntarily, the trial judge is the finder of fact." *Gavin v . State*, 473 So. 2d 952, 954 (Miss. 1985). The trial court determined that Simon's confession was freely given. The statement was then admitted into evidence and was submit ed for the jury's consideration.

¶72. Simon challenges not only the admission of the statement itself (**see** ISSUE IX. for a complete

discussion), he also challenges the trial court's denial of submitted Instruction D-26, which read:

The testimony and other evidence in this case concerning any statements attributable to Robert Simon, Jr. by any law enforcement officer or other individual has been admitted into evidence by this Court for your sole consideration and judgment as to the statements' weight and credibility. All facts and circumstances in evidence which affect the weight and credibility of any such statement are for your sole consideration as jurors, and you are not bound to believe or attach any weight or credit to any such statements on the ground alone that the court has decided that it was admissible in evidence, and you as jurors in this case have the same freedom of action with reference to the acceptance or rejection of a statement as you have in regard to other testimony and evidence.

You are the sole judges of the weight and credibility of the witnesses and if you believe from the evidence that the statement is untrue you should disregard it, or if you believe from the evidence that it was made under the influence of hope or fear, you may take that into account in determining what weight and credit, if any, you should attach to the statement.

¶73. The following colloquy occurred during Sheriff Harrison's testimony:

BY MR. MELLEN: Sheriff, can you state whether or not any statement was made by the Defendant, Robert Simon, Junior concerning the Parker incident?

SHERIFF HARRISON: There was.

BY MR. WALLS: Your Honor, I object to any statements made by Robert Simon.

BY THE COURT: On what basis?

BY MR. WALLS: On the basis, Your Honor, there has been nothing . . . shown that the statement was voluntarily given.

BY THE COURT: Statement by the Sheriff, of the testimony by the Sheriff imposes that it was freely and voluntarily given. Objection overruled.

¶74. Simon contends that the refusal of D-26 compounded by the above remarks by the trial judge creates reversible error.

¶75. In support of this assignment of error, Simon relies on *Wilson v. State*, 451 So. 2d 724 (Miss. 1984), wherein this Court reversed and remanded for new trial based on comments by the trial judge. Subsequent to a suppression hearing and during trial, the following exchange occurred:

BY MR. ALEXANDER: We object to testimony on the grounds that it is objected to [sic] the Court in a pretrial Motion to Suppress the Statement. To reiterate, we object to any statement given to the Sheriff, that it was not voluntary. That it was taken in violation of the 4th, 5th, and 14th Amendments of the United States Constitution and should be excluded and no reference to any such statement should be made at this trial.

BY THE COURT: After hearing the Motion to exclude and all evidence pertaining thereto, the Court has ruled that the statement was freely and voluntarily given. That the defendant had been

advised of his Constitutional rights. That there was no coercion, threats, promises or force used.

*Wilson v. State*, 451 So. 2d at 725.

¶76. Additionally, in *Wilson*, there was no limiting instruction given, thus the jury was not informed that they were to weigh and make an independent determination of each witness' credibility. Thus, in the *Wilson* case, there were additional remarks made by the trial court concerning Appellant's statement and its voluntariness coupled with the fact that no type of limiting instruction was submitted for the jury's consideration.

¶77. In the case sub judice, there are two important distinctions. First, unlike the facts in *Wilson*, the jury in the present case was neither privy to an extended ruling on the question of voluntariness nor was the jury told about the weight and credibility to be afforded Simon's statement. The trial court only stated that "the statement of the Sheriff <u>imposes</u> that it was freely and voluntarily given." (Emphasis added.) Furthermore, the record reflects that the jury in the present case was instructed on their power to determine and decide what weight to afford the evidence adduced at trial by instruction C-1, which stated in part:

> As sole judges of the facts in this case, your exclusive province is to determine what weight and credibility will be assigned the testimony and supporting evidence of each witness in this case. You are required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified in this case.

¶78. Likewise, the case of *Stallworth v. State*, 310 So. 2d 900 (Miss. 1975), is distinguishable as the court in that case commented on the truthfulness of a witness' testimony; and thus, the jury was directed how to value and weigh such testimony. In the present case, the trial court alluded to the fact that the statement had previously been deemed admissible and that the Sheriff's testimony "imposed" that the statement was made voluntarily by Simon. Again, C-1 was given and the jury was fully in a position to weigh and consider each witness' testimony.

¶79. We hold that the giving of instruction C-1 cured any error in the earlier exchange and the refusal of D-26, and we therefore affirm this issue.

### IX. DID THE TRIAL COURT VIOLATE SIMON'S FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS BY ADMITTING HIS STATEMENT INTO EVIDENCE?

¶80. Simon, in his first appeal, challenged the trial court's admission of his statement made to law enforcement personnel. This Court in *Simon v. State*, 633 So. 2d 407 (Miss. 1993), *vacated on other grounds*, *Simon v. Mississippi*, 115 S.Ct. 413, 130 L.Ed.2d 329, 63 U.S.L.W. 3346 (U.S.Miss. Oct. 31, 1994), considered the transcript of the suppression hearing, the statement itself, and the fact that all the officers present testified at trial, and declined to address this issue, stating that:

> [n]one of the other assignments of error Simon has proposed warrant discussion by this Court. We find no merit to any of Simon's arguments and hold his convictions for the capital murder, sexual battery and kidnaping of Charlotte Parker should be affirmed.

*Id.* at 412-13.

¶81. Ultimately, this Court affirmed the trial court's ruling on the statement's admissibility.

¶82. Simon, as part of the present appeal, once more assigns as error a violation of his Fifth, Sixth and Fourteenth Amendments, claiming the statement taken upon his arrest was obtained in violation of his **Miranda** rights. As the very same issue was raised in **Simon I** and the same evidence presented, that opinion is dispositive of this issue. The same facts and circumstances are apparent as this alleged violation occurred prior to Simon's two separate trials. Further, once again each of the officers present when Simon made his statement at the Quitman County jail testified at Simon's second trial in DeSoto County. Therefore, we affirm this issue as it is controlled by this Court's decision in **Simon I**.

¶83. We conclude that no error occurred during the guilt phase of trial, and as such we affirm Simon's three convictions of capital murder.

## III. SENTENCING PHASE

### *THE STATE'S CASE*

¶84. The State's proof at this stage was comprised of four witnesses who discussed various photographs of the victims. Steve Parker testified about certain photographs of the Parker family members and verified them as accurate representations of the victims while alive. Bill Ellis testified as to the pictures he took of the victims when the bodies were discovered. Jack Harrison testified about the victims when he initially observed them. Finally, after debate over the relevance and value of the photographs, Dr. Hayne, who performed the autopsies, corroborated and verified the exhibits pertaining to the autopsies.

### *THE DEFENSE'S CASE*

¶85. During the sentencing phase, Simon offered mitigating evidence including his turbulent upbringing, his service in the military, his work history, his family relationships and his reputation in the community. Witnesses for Simon included: Dr. William Kallman, Robert Simon's mother, Rosie Simon, and Antoinette Thomas. Finally, Simon offered as evidence the fact that he had no previous criminal record.

> **XVIII. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN REFUSING TO ALLOW SIMON TO PRESENT RELEVANT MITIGATING EVIDENCE TO THE JURY AT THE SENTENCING STAGE?**

¶86. Simon contends that the trial court impermissibly prohibited his presentation of mitigating evidence. Specifically, the trial court's refusal to permit Simon's family members to testify during the penalty phase. Simon requested that certain family members be permitted to testify in order to show the impact Simon's death would have on their lives.

¶87. The United States Constitution requires "that the jury not be precluded from considering any aspect of a defendant's character, record, or any circumstances of the offense as mitigating factors." **Ladner v. State**, 584 So. 2d 743, 762 (Miss. 1991) (*citing* **Lockett v. Ohio**, 438 U.S. 586, 98 S. Ct.

2954, 57 L. Ed. 2d 973, 990 (1978)).

¶88. This Court in *Turner v. State*, 573 So. 2d 657, 667 (Miss. 1990), *cert. denied*, 500 U.S. 910 (1991), addressed this very issue and held that this type of testimony is simply not relevant to a death sentence determination. *Accord Mease v. State*, 539 So. 2d 1324 (Miss. 1989). Accordingly, this assignment of error is without merit.

¶89. Based on the foregoing arguments and authorities, we conclude that no error occurred during the sentencing phase of Simon's trial.

<u>CONCLUSION</u>

¶90. After a thorough and careful review of the record and consideration of all issues presented by Simon, this Court finds that Simon's three convictions and three sentences are supported by the record. Finding no error occurred in either the guilt or sentencing phases of trial, this Court affirms Simon's three convictions of capital murder and sentences of death by lethal injection.

**¶91. CONVICTION OF CAPITAL MURDER (THREE COUNTS) AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7) (SUPP. 1996) AND M.R.A.P. 41(a).**

**LEE, C.J., PRATHER, P.J., ROBERTS, SMITH AND MILLS, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. BANKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J.**

      **BANKS, JUSTICE, DISSENTING:**

¶92. Once again I am compelled to dissent because of what I view as an unconstitutional handling of the venue issue in this and companion cases. See **Simon v. State**, 633 So. 2d 407, 413 (Miss. 1993) (Banks, J., dissenting), *vacated*, 115 S.Ct 413 (1994); **Carr v. State**, 655 So. 2d 824 (Miss. 1995) (Banks, J., dissenting). In short, I believe that in changing venue a trial court is compelled to take into account the racial composition of the alternate venue. Additionally, in the instant case, the situs of the trial was as or more permeated with the adverse publicity that prompted the original request for a change of venue and defendant's second request for a change of venue or in the alternative to revoke his original request for a change of venue should have been honored.

I.

¶93. Here, as in the other cases arising out of this horrendous crime, venue was changed from Quitman County because pretrial publicity, some of which was wrongfully generated by state, made it presumptively impossible to secure a fair trial there. **Simon I**, 633 So. 2d at 411. In this case, as in the others, the trial court refused to consider defendant's request to have the trial in a county of

similar racial characteristics. Here, as in the other cases, the ultimate trial site was drastically different in racial composition from the site of the crime. Desoto county has a 15% black population compared to Quitman county's 54%. The venire from which the jury was chosen here was less than 9% (9 of 105) black. Sixty-two of the 82 counties in Mississippi have higher black population than Desoto county.

¶94. The majority suggests that Simon is "forum shopping". On the contrary, Simon simply suggests the consideration of a criteria to inhibit and correct an otherwise unfettered venue selection process which had the potential to and did, in effect, systematically exclude members of his race from the venire. To the extent that is this is "shopping" it is not, in my view, to be frowned upon. It is, instead, the exercise of a strength at least equal to that of seeking a forum untainted by adverse pre-trial publicity.

¶95. For the reasons more fully stated in my dissents in **Simon I** and **Carr**, I believe that the transfer of a case such as this to a county drastically different in racial composition, absent a compelling reason to do so, is an unconstitutional deprivation of the right to be free from systematic exclusion of members of one race from the trial jury and the right to a jury drawn from a fair-cross section of the fair cross-section of the community. **Id.** See **Simon v. State**, 633 So. 2d 407, 413 (Miss. 1993) (Banks, J., dissenting); **Carr v. State**, 655 So. 2d 824 (Miss. 1995) (Banks, J., dissenting).

II.

¶96. The choice of venue in the instant case has the added defect of such close proximity to the site of the crime as to suffer from the same saturation of publicity. Desoto County is one county removed from Quitman County and adjacent to Memphis, Tennessee, the site of the primary media outlets serving the area. The area was saturated with coverage of Simon's first trial and that of his co-defendant Carr the month before. Carr's trial was held in Corinth, which is well within the Memphis media market. The record reflects testimony that one or more articles appeared in the Memphis Commercial Appeal, the predominant newspaper in the area, every day for the one-month period preceding the trial. Reports included inflammatory and inadmissible information including accusations that Simon was responsible for a number of other violent crimes and interviews with his wife concerning the crime in question.

¶97. It is not surprising, then, that 52 of the approximately 84 venire members available at the time (21 of the 105 had previously been excused for cause), responded that they had heard something about the case. Sixteen of these admitted that they had formed opinions and all but two of those further admitted that they could not set those opinions aside. Some of those who had heard about the case served on the jury. Simon's request for additional challenges was denied.

¶98. The substantial and adverse publicity rivals or exceeds that in any of the cases where we have had to consider this issue. *See e. g.,* **Fisher v. State**, 481 So. 2d 203 (Miss. 1985); **Lutes v. State**, 517 So. 2d 541 (Miss. 1987). I would hold that Simon was entitled to another change of venue from Desoto county to a county "substantially outside the coverage area", or in the very least, a delay in his trial because pre-trial publicity had rendered the of a fair trial by an impartial jury doubtful. **Fisher v. State**, 481 So. 2d at 223.

III.

¶99. The defendant has right to be tried in the county where the offense occurred. **Fairchild v. State**, 459 So. 2d 793 (Miss. 1984); Miss. Code Ann. § 99-11-3; Miss. Const. Art. III, § 26. As with other rights this one is subject to waiver. Simon contends that his was a conditional waiver. That is he waived his right to a trial in Quitman county conditioned upon a choice of venue with a racial make-up comparable to that in Quitman county. Moreover, the basis for the change, pre-trial publicity, further conditions the waiver, implicitly, upon a selection of venue where that factor could be deemed diminished. Neither condition was met here.

¶100. While we have not dealt with a "conditional" waiver of a constitutional right, we have treated a revocation of waiver of the right to venue. **State v. Caldwell**, 492 So. 2d 575 (Miss. 1986). In **Caldwell** this Court held that waiver of right to be tried in the county of the offense may be reinvoked after a the result of the first trial has been reversed. **Id. Caldwell** dealt with a new trial on sentencing only. Because of that this Court took pains to point out that revocation of waiver at the sentencing phase of an ordinary bifurcated proceeding would not be in order. **Id**. at 577. That is not the case here. Simon reasserted his right to be tried in the county of the offense prior to trial. Given the fact that Simon had conditioned his waiver from the beginning and the fact that the justification for the change of venue, pretrial publicity, was not cured by the moving to Desoto County, it was an abuse of discretion to fail to honor Simon's assertion of his right to be tried in Quitman County.

**SULLIVAN, P.J., JOINS THIS OPINION.**


# A P P E N D I X

## DEATH CASES AFFIRMED BY THIS COURT

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

**\*Shell v. State**, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

**\*Pinkney v. State**, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

**\*Clemons v. State**, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

**\*Jones v. State**, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

## DEATH CASES AFFIRMED BY THIS COURT

(*continued*)

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

## DEATH CASES AFFIRMED BY THIS COURT

(*continued*)

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court,case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

## DEATH CASES REVERSED AS TO GUILT PHASE

### AND SENTENCE PHASE

(*continued*)

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

### FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## <u>ON SENTENCING PHASE ONLY</u>

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi***, 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State*** 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

\**Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi,*** 494 U.S. 1075 (1990) vacating and remanding, ***Pinkney v. State,*** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

***Jones v. State***, 517 So. 2d 1295 (Miss. 1987), ***Jones v. Mississippi,*** 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* --- So. 2d --- (Miss. 1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## ON SENTENCING PHASE ONLY

(*continued*)

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

1. The indictment concerning the capital murder charge pertaining to Charlotte Parker was tried separately. Simon was convicted of capital murder, sexual battery and kidnaping. After the sentencing phase, the jury failed to reach a unanimous verdict as to the imposition of the death penalty. Consequently, Simon was sentenced to life imprisonment for capital murder; thirty (30) years for sexual battery; and thirty (30) years for kidnaping. This Court considered this appeal and affirmed both the conviction and sentences in *Simon v. State*, 633 So. 2d 407 (Miss. 1993), *vacated on other grounds Simon v. Mississippi*, 115 S.Ct. 413, 130 L.Ed.2d 329, 63 U.S.L.W. 3346 (U.S.Miss. Oct. 31, 1994).

2. The issues discussed in this opinion and as set out in Roman numerals and capital letters are quoted as written in Mr. Simon's brief.

3. Sprall's address was 109 9th Street, located inside the Clarksdale city limits and within the immediate area where the Parker truck was discovered and identified.

4. Martha Simon spent the night with her mother in Clarksdale on February 2, 1990.

5. Testimony later revealed that Martha Simon made the call.

6. Anthony Carr was also indicted for the Parker murders. He was tried separately on four counts of capital murder and found guilty on all counts. The jury sentenced Carr to death by lethal injection on all four counts. This Court considered Anthony Carr's appeal and affirmed both his convictions and sentences in *Carr v. State*, 655 So. 2d 824 (Miss. 1955).

7. Present in the record are additional statements made by these jurors which cast further doubt on their ability to serve. Ms. Hinson, Ms. Etheridge and Ms. Williams all alluded to their families interfering with jury service.

8. District Attorney Mellen initially attempted to remove Jamison for cause stating that because she had two (2) children and a blind grandmother to care for, she could not sit through a trial and be fair and impartial.